**In the Matter of H.L.F. et al.**

Court of Appeals of Tennessee, Eastern Section, at Nashville.

Jan. 9, 2009 Session.

Feb. 4, 2009.

Permission to Appeal Denied by Supreme Court June 15, 2009.

Published Pursuant to Tenn. R. S. Ct. Rule 4(D).

James Reed Brown, Byrdstown, Tennessee, for the appellant, T.W.

Onnie Winebarger, Byrdstown, Tennessee, for the appellant, J. F.

Robert E. Cooper, Jr., Attorney General and Reporter, Michael E. Moore, Solicitor General, and Joshua D. Baker, Assistant Attorney General, for the State of Tennessee, Department of Children's Services.

Amy V. Hollars, Livingston, Tennessee, Guardian Ad Litem.

## OPINION

FRANK G. CLEMENT, JR., J., delivered the opinion of the court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

The unmarried parents of four minor children appeal the circuit court's finding that their four children are dependent and neglected and that both parents committed severe abuse. The circuit court found the four children dependent and neglected pursuant to Tenn.Code Ann. § 37–1–102(b)(12)(B), (F), and (G), and found that both parents perpetrated severe child abuse against their children due to the father's sexual abuse of three minor girls in the home, including aggravated rape and aggravated sexual exploitation of their twelve-year-old daughter, and the mother's knowing failure to protect her children. The circuit court also found that aggravated circumstances existed and, therefore, pursuant to Tenn.Code Ann. § 37–1–166(g)(4)(A) the Department of Children's Services was no longer required to make reasonable efforts to assist the parents in obtaining services so they could be reunited with their children. Finding no error and that the evidence in the record is clear and convincing, we affirm.

J.F. (Father) and T.W. (Mother), the defendants/appellants, are the unmarried parents of four minor children, a daughter age 12 (whom we shall identify as Heather),[1] and three boys, ages 10, 8 and 6, respectively.

The matters at issue came to light on February 23, 2006, when the Sheriff's Department of Pickett County received a referral alleging Father had raped a 9–year–old girl (whom we shall identify as "Ally"), who was a friend of the parent's 12–year–old daughter, Heather. After investigations and a doctor's examination confirmed sexual abuse of Heather and Ally, the Department of Children's Services (DCS) filed this Dependent and Neglect action on April 13, 2006, against both parents. The petition alleged that the children were dependent and neglected because of the sexual abuse Father had perpetrated upon Ally and Heather, and because Mother had failed to protect the children from Father's sexual abuse. Two days after the petition was filed, a second referral was received in which it was alleged that Father sexually abused another child (whom we shall identify as "Amy"), who frequently visited

---

1. All of the names attributed to minors in this opinion are fictitious. Thus, Heather is not the real name of the defendants' daughter.

Heather in the defendants' home. After the second referral was received, a search warrant was obtained and the resulting search discovered explicit sexual material and internet photos, etc., in the defendants' home. As the investigation ensued, three of the minors stated that Father had sexually abused them, and two other minors stated they had seen him rape or sexually abuse a child.

On March 27, 2007, the Juvenile Court of Pickett County adjudicated the children dependent and neglected and found that Father and Mother had subjected the children to severe abuse. The parents appealed the matter to the circuit court. The case was tried in the Circuit Court of Pickett County on August 20 and 21, 2007. In a thorough twenty-one page Findings of Fact and Conclusions of Law For Circuit Court Appeal of Adjudicatory and Dispositional Hearing Order, the circuit court adjudicated the children dependent and neglected and found that Father and Mother had subjected the children to severe abuse. The circuit court also made numerous and specific findings of fact, of which the following are the most relevant to the issues presented:

1. Tennessee DCS received a referral on February 25, 2006, stating that [Ally], then age nine, had been sexually abused by [Father] and that [Ally] had witnessed [Father] also sexually abuse his own daughter, [Heather], then age twelve.

2. On April 5, 2006, DCS received a referral that [Father] has sexually abused [Amy].

3. DCS has indicated [Father] for the sexual abuse of [Ally], [Amy] and [Heather] and has indicated [the parents' three minor sons] as being at substantial risk of harm.

4. [Ally] was examined at Wayne County Hospital in Kentucky on February 25, 2006. Dr. Walter Koscienski testified by deposition that when he interviewed [Ally] she told him that when she went to [Father's] house, [Father] would take all their clothes off and touch them, meaning herself and [Heather]. When asked where he touched them, [Ally] pointed to her nipples, vaginal area and bottom. [Ally] told him that [Father] touched her privates and inside her bottom with his penis. [Ally] denied any oral contact by [Father]. [Ally] also stated that she saw [Father] rubbing his penis and "water" coming out. Dr. Koscienski testified that he received specialized training in pediatric examinations of children who have been sexually abused from Dr. Martin Finkle, who has published multiple times on this subject. During Dr. Koscienski's examination of [Ally's] genitals, he found that her labia majora was swollen and inflamed. The hymen was missing. He opined that the absence of the hymen indicated the child had been penetrated multiple times, resulting in the hymen being rubbed away. He did not find any of the other abnormalities in [Ally's] genitalia that would be associated with congenital absence of the hymen and therefore opined that the probability of the absence of [Ally's] hymen being congenital was zero. Dr. Koscienski also opined that the absence of the hymen could not be attributed to accidental means.

5. Sue Ross, RN, MSN, who is a nurse practitioner with Our Kids Center, testified via her previously recorded testimony in Juvenile Court regarding her medical examination of [Heather] on August 23, 2006 and testified extensively regarding medical findings in children who have been sexually abused. Ms. Ross has more than sixteen years of experience performing pediatric sex abuse medical examinations at Our Kids Cen-

ter and is an Associate Professor in the Department of Pediatrics at Vanderbilt University School of Medicine. Ms. Ross' examination of [Heather] revealed no medical evidence that is definitive of sexual abuse. She found a cleft in the hymen at the 7:00 o'clock position, that could be the result of penetrating trauma, but because the cleft did not go all the way to the base of the hymen, it is not definitive of sexual abuse. Ms. Ross explained that because children usually are not experienced in sexual intercourse, they do not know what full penile penetration feels like. Children often believe they have been penetrated when the exterior genitalia has been penetrated or they feel pressure on their genitalia. Ms. Ross explained that masturbation, horseback riding and riding a bike do not cause injury to the hymen. Accidental injury that caused injury to the hymen would require significant injury to the external genitalia and laceration or tearing of the external genitalia going through to the hymen. She testified that the use of tampons and even the use of a speculum for a medical examination would usually not damage the hymen. She also testified that penetration by a child during masturbation was highly unlikely. Ms. Ross testified that many forms of child sexual abuse, including oral genital contact, touching or rubbing the genitalia, either outside or inside the external genitalia, without penetration beyond the hymen into the vaginal vault, with either the hand or penis, would be expected to leave no medical evidence of sexual abuse. Digital penetration is also likely to leave no medical; [sic] evidence. Ms. Ross' experience is that children's response to sexual abuse is very variable. She stated that no assumptions can be made regarding whether the sexual abuse would have been painful, because you can not [sic] make assumption from the statements of children as to [how] far they were penetrated.

6. Lisa Dupree, MA, LCSW, testified via her previously recorded testimony in Juvenile Court regarding her interview of [Heather] on August 23, 2006. Ms. Dupree is a Licensed Clinical Social Worker, who has worked at Our Kids Center for fifteen years. She has assessed between six and seven thousand children who are alleged to be victims of sexual abuse. [Heather] did not want to talk about the allegations of sexual abuse, but did tell her that she would rather stay in the foster care than go home. Ms. Dupree testified that it is atypical for children to scream while they are being sexually abused. Based upon her experience, while it is not the most common scenario for a sex offender to abuse one victim in front of another victim, it is not atypical. It is highly unusual for children to insert objects into their vagina when masturbating.

7. Ginny Douglas, Director of Forensic Interviewing for the Children's Advocacy Center of the Cumberlands, testified regarding her interviews of [the parents' three minor sons].... Ms. Douglas has been trained as a forensic interviewer since 2004. During his interview [the parents' son] who was six years old at the time of the interview, stated that his Daddy touched [Heather] on her pee pee with his hand. [He] stated that [Heather] had her clothes off. [He] told Ms. Douglas that he would rather live with his foster mother ... than his mother, ... Ms. Douglas asked [the parent's six-year-old son] if he knew what sex was and he said yes and pointed to the penis of the anatomical drawing of a boy. When asked if he had ever seen anyone have sex, he indicated yes. [He] also said that his daddy watched movies with

people with no clothes on. [The parents' eight-year-old son] told Ms. Douglas that he would rather live with his foster mother, ..., than his Mommy and Daddy. [He] indicated that his father would touch his Mommy with his pee pee. He also said that he had seen magazines of people with no clothes on that belong to his Daddy. [He] indicated that his older brother, ... had touched [his] pee pee. [The parents' ten-year-old son] stated that his eight-year-old brother ... would hold and pinch [the six-year-old brother's] pee pee. [The ten-year-old] also indicated that his father had magazines and movies of people with no clothes on. [The ten-year-old] said [his six-year-old brother] had watched these movies and that his [eight-year-old brother] hated these movies. [The ten-year-old] said that he saw his daddy have sex with a blond haired girl. The audio tape of Ms. Douglas' interview with [the ten-year-old] reveals that when forensic interviewer, Ginny Douglas, asked [the ten-year-old] if his father had sex with either [Amy] or [Ally], [he] replied: "No, it was my sister [Heather]." His response was apparently not clear to Ms. Douglas, and she asked if he was talking about [Heather's] friend. He stated, "My Daddy has sex with [Heather]." He was asked whether they were in a bedroom, and he replied "Yes ... Upstairs."

8. Tracy Plant, forensic interview[er] with the Upper Cumberland Child Advocacy Center, testified about her forensic interviews of [Amy], [Ally], ... and [Heather]. [Amy] and [Ally] both revealed sexual abuse by [Father] to them and to [Heather]. [Ally] was able to given [sic] verbal descriptions of multiple incidents of sexual abuse, corrected the interviewer when she misunderstood or misstated [Ally's] statements and used gestures to demonstrate what occurred during the abuse.

9. Former Pickett County Sheriff's Department Chief Deputy, Eric Pierce testified regarding his role in the investigation. He testified that on April 5, 2006, when DCS case manager Jay Boulton told [Mother] that there were allegations of [Father's] sexual abuse by two girls, she was unbelieving and belligerent. She refused to ask [Father] to leave the home. She did not agree to sign a safety plan to keep [Father] away from her children until [Father] told her he would leave the home and told her to sign the plan so the children would not be placed in foster care. He testified that on the day the children were placed in foster care, [Heather] very willingly got in his patrol car and told her brothers to come on. He testified that on the day they executed the search warrant for the [parents'] home they were not able to secure the home and [Mother] and other relatives were in and out of the home. He found 10 to 12 adult pornographic videos in a box on a s[h]elf in the room w[h]ere the computer is kept. Mr. Pierce is familiar with the neighborhood w[h]ere the [parents] live and stated that when he has been there after dark, that it is not pitch dark due to outdoor lighting from surrounding homes.

10. Investigator Terry Hembree, from the District Attorney's Office, Thirteenth Judicial District, testified as to his role in the investigation. He interviewed [Father] and [Mother] on April 5, 2006.... [Father] refused to make any statements. [Mother] stated she did not believe [Father] had sexually abused any children and denied there were any pornographic pictures on her computer. He testified that in addition to the 10 to 12 adult pornographic videos found in a box in the computer room, he

found pornographic magazines, including Playboy, Virgin Cuties and Hustler and pornographic photographs in an envelop[e] on the s[h]elf of [Father's] and [Mother's] closet.... [Exhibit][2] is a picture of [Mother] using a pink and blue dildo and [Exhibit] is a picture of [Mother] sitting at her computer, scantily dressed in a bikini style nightgown. The dildo in [Exhibit] matches a description given by [Ally] of a sex toy the [defendants'] boys showed her in [Father's] drawer. The bikini style nightgown matches description by both [Ally] and [Amy] of the attire [Mother] would wear while sitting at her computer....

11. Tennessee Bureau of Investigations Agent Doug Williams testified as to his forensic evaluation of [Mother] and [Father's] computer. He found nine pictures of [Mother], which were admitted as an exhibit. Some of these pictures go beyond being just nude pictures and are pornographic due to her use of a sexual device. Agent Williams found two pictures of [Father], which were also admitted as exhibits and go beyond just being nude pictures and are pornographic due to the pictures showing his erection. He also found six pictures saved on the computer which had been downloaded from the internet. All but one of these pictures, which were admitted as an exhibit, either show explicit sexual acts or sadism, thus making them clearly pornographic. Agent Williams testified that these pornographic pictures from the internet were saved in an easily accessible folder on the computer. The pictures of [Mother] and [Father] were found in the recycle bin.

12. Phyllis Thompson, LCSW testified via her previously recorded testimony in Juvenile Court. She reviewed all of the DVDs, audio tapes, transcripts, medical reports and documents from the investigation in this case. Ms. Thompson is a Licensed Clinical Social Worker with Our Kids Clinic and Instructor in the Department of Pediatrics at Vanderbilt University School of Medicine. She has experience working both with victims of sexual abuse and sex offenders.... Ms. Thompson gave her professional opinion that all of the [Defendants'] children were at high risk of sexual abuse and exposure to inappropriate sexual materials in the [Defendants'] home.

13. [Ally] during one of her interviews stated that she told [Father's sister] about seeing [Mother] and [Father] looking at a video that showed boy's and girl's privates. [Ally] also said she told [Father's sister] about [Father] bothering [Heather] and herself. [Ally] said [Father's sister] told her she would take care of it. During her testimony, [Father's sister] said that [Ally] told her about [Mother] "talking" to a man on the computer and that she told [Ally] she would take care of it. This partially confirms [Ally's] statement. It makes no sense that [Father's sister] would feel a need to "take care of" [Mother] talking to a man on the computer. Therefore [Ally's] statement is more credible.

14. During her testimony, [Mother] clearly stated that she did not believe [Father] had sexually abused [Ally, Amy or Heather]. She denied that her children had seen the adult pornographic movies and said these movies were kept on a top shelf in the computer room and she knew it was hard for her children to reach them because some of the chil-

---

**2.** The trial court made numerous citations to specific Exhibits by number or other identifying information in its findings of fact, such as this reference to Circuit Court Exhibit # 29. All of the references to specific Exhibits are redacted from the following quote to shorten the quoted material and to make it easier to read.

dren's movies were stored in the same box. She indicated she was aware of the boys touching each other's penises, but dismissed this highly inappropriate sexualized behavior as the boys merely wanting to really hurt each other when they fought. She testified that the pornography found in the home was for her[']s and her husband[']s use. She testified that she was told by her parenting instructor that she was so good at parenting that she could teach the course. Her actions of not being properly clothed in front of children, putting children's videos in the same box with pornography, exposing the children to sexual implements and pornographic materials contradict her claim of expertise in proper parenting.

15. [Mother] admitted that her testimony that [Ally] could not have seen the pink and blue dildo that was in the pornographic picture of her which is [Exhibit] because she borrowed the dildo from her mother (further explanation showed that her mother is deceased and she asked her father if she could [have] it) and only had it in her home for one day in March 2006 was not true. Receipt admitted into evidence showed that she possessed the camera from which she says the pictures were taken during the time frame [Ally] was in her home.

16. [Father] did not testify. . . .

17. Former DCS Team Leader, Gail Jowers, interviewed [Heather] on February 26, 2006. The court has reviewed an audio CD of the 2–26–06 interview, . . . and a transcript of this interview . . . The interviewer did not ask open ended questions, thus reduced the opportunities for narrative responses and spontaneous comments. Subsequent interview of [Heather] by DCS are similarly flawed. [Heather] denied being sexually abused.

18. Ms. Jowers' interview of [Ally] on June 27, 2006 . . . was confusing and coercive. Despite the interrogation nature of this interview, [Ally] continued to maintain that she and [Heather] were sexually abused by [Father]. She was not only able to verbalize the abuse, but was also able to demonstrate how certain incidents occurred. [Ally's] statements of sexual abuse are very credible and as set out above, many of her statement[s] are corroborated by exhibits and the statements and testimony of others.

19. Gail Jowers' testimony and the exhibits show that after a meeting in May 2006, where concerns about how she handled this case were discussed, she took steps to vindicate herself rather than to investigate the case in an unbiased manner.

20. Not only do two of the [defendants'] boy's statements corroborate sexual abuse by [Father], they all indicate exposure to sexually explicit materials and inappropriate sexual knowledge and sexualization for their ages.

21. [Mother's] testimony revealed several indicators of inappropriate sexual boundaries. She admitted that she and her husband used their [ten-year-old son's] bedroom for a "pornographic photo shoot". In [Exhibit] she is posing on her son's twin bed with a Teenage Mutant Ninja Turtle bedspread. She also testified that the dildo that she is using in [Exhibit] use[d] to belong to her mother. She apparently does not find it inappropriate for her children to see her dressed in a scanty, sexy nightgown. She apparently believes it is appropriate to store adult pornographic movies with children's movies. She minimizes her children's inappropriate sexual behavior and apparently leaves pornographic materials in her house and on her computer

where her children have easy access to it.

22. DCS case man[a]ger Steele Stone testified that while [Mother and Father] did complete in-home parenting classes and [Mother] completed a psychological evaluation, [Father] refused to have a psychosexual evaluation. The Court finds that DCS did make reasonable efforts to provide services to [Mother and Father] prior to the Juvenile Court's Order of March 27, 2006 relieving it of that duty by providing in-home parenting classes, providing a psychological evaluation for [Mother] and offering to provide a psychosexual evaluation for [Father]. DCS case manager Julie Mahaney testified that DCS also offered therapeutic visitation for [Mother] with the children. There is a restraining order in place preventing visitation between the children and [Father]. Ms. Mahaney listened to one of the five home-made CDs that were marked for identification purposes as [Exhibit]. These CD[s] had recently been given to the children by their mother. Some of the songs on the CD were inappropriate for these children. The lyrics of one song were very explicit about using drugs and sex acts. [Heather] told Ms. Mahaney no [t] long before this hearing that she did not want to return home. The parents have failed to address the most important issue that requires these children to be in foster care—the sexual abuse of the girls, the exposure of the boys to the sexual abuse of the girls, the exposure of the children to "sex toys," the exposure of the children to the parents' sexual activity and the exposure of the children to pornography. The children have all given indications that they do not wish to return home to their parents.

. . . .

Following a discussion of the burden of proof and the standard for substantial harm in dependent and neglect cases in its order, the trial court set forth the following conclusions of law that are relevant to the issues on appeal:

*Substantial Harm:* . . . .

The court finds that there is clear and convincing evidence that [Heather and the three boys] have been exposed to substantial harm in their parent's home. At the very least all of these children have been sexually exploited by their exposure to their parent's sexual behavior, nudity or near nudity, sex toys and pornographic magazines, movies and photographs. In addition, [Ally's] statements of sexual abuse by [Father] are very credible. Due to her age, the inadequate and even coercive nature of some of the interviews of this child and the human brain's inability at any age to have perfect recall of every detail, her disclosures are consistent and credible. Many facts in her statements are corroborated by the other children, witnesses and exhibits. Thus the [defendants'] children would be at risk of substantial harm from sexual abuse and emotional abuse from the sexual exploitation if returned to their parents' home.

*Dependent and Neglected:* . . . .

There is clear and convincing evidence that [Heather and the three boys] are dependent and neglected pursuant to Tenn.Code Ann. § 37–1–102(b)(12)(B) ["Whose parent, guardian or person with whom the child lives, by reason of cruelty, mental incapacity, immorality, or depravity is unfit to properly care for such child"], (F) ["Who is in such condition of want or suffering or is under such improper guardianship or control as to injure or endanger the morals or health of such child or others"]; and (G) ["Who is

suffering from abuse or neglect"] due to the sexual exploitation of these children and the sexual abuse at the very least of [Ally and Heather] by [Father]. [Mother] is unbelieving and therefore would not be protective of the children from the risk of sexual abuse. She actively participated in the sexual exploitation of the children. Exposing these children to pornography, sexual abuse of other children, the parents' sexual activity and "sex toys" is immoral and makes these parents unfit to properly care for the children. The children's emotional health and morals are clearly endangered. The children suffer from emotional abuse and neglect from the sexual exploitation alone.

Having found the children to be dependent and neglected, Tenn.Code Ann. § 37–1–129(a)(2) now requires the court to make a finding regarding whether or not the parents committed severe child abuse.

*Severe Child Abuse:* Tenn.Code Ann. § 37–1–102(b)(21) defines severe child abuse as "(A) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause great bodily harm or death and the knowing use of force on a child that is likely to cause great bodily harm or death; (B) Specific brutality, abuse or neglect toward the child which in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or retardation, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct; (C) the commission of any act toward the child prohibited by Sections 39–13–502[,] 39–13–504, 39–13–522, 39–15–302, and 39–17–1005 or the knowing failure to

protect the child from the commission of any such act toward the child; or (D) Knowingly allowing a child to be present within a structure where the act of creating methamphetamine, as the substance is identified in 39–17–408(d)(2), is occurring."

The court finds that [Mother and Father] have perpetrated severe child abuse against these children pursuant to Tenn.Code Ann. § 37–1–102(b)(21)(C) ["the commission of any act toward the child prohibited by Sections 39–13–502[,] 39–13–504, 39–13–522, 39–15–302, and 39–17–1005 or the knowing failure to protect the child from the commission of any such act toward the child."]

The final order was entered on April 8, 2008, from which Father and Mother both filed timely appeals.

The issues on appeal are whether the court erred in finding sufficient evidence of severe child abuse by Father and Mother, and whether the children are dependent and neglected.

## ANALYSIS

A parent's right to the care and custody of his or her child is among the oldest of the liberty interests protected by the due process clauses of the federal and state constitutions. *Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Hawk v. Hawk,* 855 S.W.2d 573, 578–79 (Tenn.1993); *Ray v. Ray,* 83 S.W.3d 726, 731 (Tenn.Ct.App. 2001). Although this right is fundamental, and superior to claims of the government and other persons, it is not absolute. *State v. C.H.K.,* 154 S.W.3d 586, 589 (Tenn. Ct.App.2004). The right continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination, *Blair v. Badenhope,* 77

S.W.3d 137, 141 (Tenn.2002), such as when the child is found to be dependent and neglected, *see* Tenn.Code Ann. § 37–1–130(a), or when a parent is found to have engaged in severe child abuse, *see* Tenn. Code Ann. § 37–1–130(c).

The fact a child is dependent and neglected and the fact a parent has engaged in severe child abuse must be established by clear and convincing evidence. Tenn. Code Ann. § 37–1–129(c); *Tenn. Dep't of Children's Servs. v. M.S.*, No. M2003–01670–COA–R3–CV, 2005 WL 549141, at *10 (Tenn.Ct.App. Mar. 8, 2005) (holding that despite the lack of a statutory requirement that severe child abuse be shown by clear and convincing evidence, due to the consequences of such a finding the clear and convincing standard must be applied). For the evidence to be clear and convincing, the evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn.2002) (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn.1992)). The evidence should produce a firm belief or conviction as to the truth of the allegations sought to be established. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn.Ct.App.2007); *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn.Ct.App.2006). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn.Ct.App.2005) (quoting *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn.Ct.App. 2000)).

This court reviews the trial court's findings of fact *de novo* on the record accompanied by a presumption of correctness, "unless the preponderance of the evidence is otherwise." Tenn. R.App. P. 13(d); *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn.Ct. App.2004). If some of the trial court's factual findings are based on its determinations of the credibility of the witnesses, this court will afford great weight to those credibility determinations, and will not reverse such determinations absent clear evidence to the contrary. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995).

Whether the ultimate issues of dependency and neglect or severe child abuse have been established by clear and convincing evidence are questions of law, which we review *de novo* with no presumption of correctness. *See In re the Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007) (holding in a termination of parental rights case that "[a]s a question of law, the trial court's ruling that the facts of this case sufficiently support the termination ground of willful abandonment are reviewed *de novo* with no presumption of correctness."); *see also In re Valentine*, 79 S.W.3d at 548 (holding that the question of substantial noncompliance with the requirements of a permanency plan was a question of law reviewed *de novo* with no presumption of correctness). To the extent the trial court made findings of fact in support of the ultimate issues, we review the factual findings pursuant to Tenn. R.App. P. 13(d), *de novo* with a presumption of correctness unless the evidence preponderates otherwise. *In re A.T.P.*, No. M2006–02697–COA–R3–JV, 2008 WL 115538, at *4 (Tenn.Ct.App. Jan. 10, 2008) (holding that findings of fact in a dependency and neglect action for severe child abuse are "presumed to be correct unless the evidence preponderates against them"); *see also In re the Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re M.L.P.*, 228 S.W.3d at 143–44. However, the trial court's conclusions of law concerning the ultimate issues are reviewed *de*

*novo* without a presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001); *see also In re A.T.P.*, 2008 WL 115538, at *4. Therefore, this court will review the trial court's specific findings of fact in support of its ultimate conclusions *de novo*, pursuant to Tenn. R.App. P. 13(d), with a presumption of correctness; however, we will review those conclusions of law, that the parents engaged in severe child abuse and that the children are dependent and neglected, *de novo* with no presumption of correctness.

We have closely examined the evidence in the record and determined that the evidence does not preponderate against the trial court's specific findings of fact leading up to its ultimate conclusions of law. Thus, the issues for our determination are whether the facts as found by the trial court clearly and convincingly support the trial court's conclusions that the children are dependent and neglected and that Father and Mother engaged in severe child abuse.

### A.

■ The trial court found the children dependent and neglected due in part to the fact Father engaged in severe child abuse. A "dependent and neglected child" is statutorily defined as a child:

(A) Who is without a parent, guardian or legal custodian;

(B) Whose parent, guardian or person with whom the child lives, by reason of cruelty, mental incapacity, immorality or depravity is unfit to properly care for such child;

(C) Who is under unlawful or improper care, supervision, custody or restraint by any person, corporation, agency, association, institution, society or other organization or who is unlawfully kept out of school;

(D) Whose parent, guardian or custodian neglects or refuses to provide necessary medical, surgical, institutional or hospital care for such child;

(E) Who, because of lack of proper supervision, is found in any place the existence of which is in violation of law;

(F) Who is in such condition of want or suffering or is under such improper guardianship or control as to injure or endanger the morals or health of such child or others;

(G) Who is suffering from abuse or neglect;

. . . .

Tenn.Code Ann. § 37–1–102(b)(12)(A)–(G).

"Severe child abuse" is statutorily defined as:

(A) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause great bodily harm or death and the knowing use of force on a child that is likely to cause great bodily harm or death;

. . . .

(C) The commission of any act towards the child prohibited by §§ 39–13–502[,] 39–13–504, 39–13–522, 39–15–302, and 39–17–1005 or the knowing failure to protect the child from the commission of any such act towards the child;. . . .

Tenn.Code Ann. § 37–1–102(b)(21)(A), (C). Two of the crimes specified in Tennessee Code Annotated § 37–1–102(b)(21)(C) as constituting severe child abuse are the rape of a child and aggravated sexual battery. The rape of a child is defined in Tennessee Code Annotated § 39–13–522(a) as the sexual penetration of a victim who is less than thirteen (13) years of age. Aggravated sexual battery is defined in Tennessee Code Annotated § 39–13–504(a)(4) as sexual contact with a victim who is less than thirteen (13) years of age.

The record is replete with direct evidence from several witnesses, albeit minors, stating that they witnessed Father raping and/or sexually assaulting his daughter and one of her friends, Ally, both of whom are under the age of thirteen. Their testimony is corroborated directly or indirectly by medical experts and the testimony of other professionals. The children's statements are also validated by the substance of the numerous exhibits, photographs, magazines, videos, and "sex toys," which the children accurately identified. Father did not testify; thus, he did not refute the evidence introduced at trial against him, and the witnesses who testified favorably to Father—Mother and Father's sister—could only cast doubt on the children's statements, and the testimony of Mother and Father's sister was found not credible by the trial court. We, therefore, find that the record contains clear and convincing evidence to support the conclusion that Father engaged in severe child abuse by engaging in child rape and aggravated sexual battery, just to name a few of the crimes he committed with children under the age of thirteen years of age.

There is also clear and convincing evidence that Father's ten-year-old son had witnessed Father having sex with Heather. Statements by two of the boys corroborate sexual abuse by Father, and establish the fact that the boys were exposed to sexually explicit materials and have inappropriate sexual knowledge and sexualization for their ages. Furthermore, their statements establish the fact that Father exposed the boys to his sexual abuse of at least two minor girls, and exposed them to "sex toys," to the parents' sexual activity, and to numerous and varied pornographic materials. Father's acts constitute severe child abuse. A dependent and neglected child is one who is suffering from abuse or neglect. Tenn.Code Ann. § 37–1–102(b)(12)(G). Therefore, the finding that Father engaged in severe child abuse is a sufficient basis, on its own, to find the children dependent and neglected.

There is also sufficient evidence to clearly and convincingly establish that Father is unfit to properly care for his children. A child whose parent "by reason of cruelty, mental incapacity, immorality or depravity is unfit to properly care for such child" is a dependent and neglected child. Tenn. Code Ann. § 37–1–102(b)(12)(B). The evidence in this record clearly and convincingly establishes that Father, by reason of cruelty, immorality and depravity, is unfit to properly care for any of the four children, thereby providing a second basis upon which to find the children are dependent and neglected.

## B.

 Although the record is replete with direct evidence that Father sexually abused Heather, Ally and others, there is no direct evidence that Mother actively engaged in or witnessed the rape or aggravated sexual battery of Heather or Ally in her home. This fact, however, does not prevent the court from finding that she, too, is guilty of severe child abuse, and that the children are dependent and neglected. This is because "[p]arents have a duty to provide, and children have a corresponding right to be provided with, a safe environment, free from abuse and neglect." *In re R.C.P.*, No. M2003–01143–COA–R3–PT, 2004 WL 1567122, at *6 (Tenn.Ct.App. July 13, 2004) (citing *M.F.G. v. Dep't of Children & Families*, 723 So.2d 290, 292 (Fla.Dist.Ct.App.1998); *C.L.S. v. C.L.S.*, 722 S.W.2d 116, 121 (Mo. Ct.App.1986); *In re S.D.S.*, 648 S.W.2d 351, 353 (Tex.Ct.App.1983); *West Va. Dep't of Health & Human Res. ex rel. Wright v. Doris S.*, 197 W.Va. 489, 475 S.E.2d 865, 879 (1996)). Accordingly, a parent who has not directly abused her

own child may still be found to have committed severe child abuse if she "knowingly exposed the child to, or knowingly failed to protect the child from, conduct constituting severe child abuse." *Id.* (citing Tenn.Code Ann. § 37–1–102(b)(21)(A)–(C)).

"Knowing" and "knowingly" are not defined in Tenn.Code Ann. § 37–1–102, or in any other statute pertaining to dependency and neglect proceedings to terminate parental rights or in other civil proceedings involving juveniles.[3] "The words 'knowing' and 'knowingly' do not have fixed or uniform meanings, and their meanings vary depending on the context in which they are used or the character of the conduct at issue." *Id.* at *7 (citing *Still v. Comm'r of the Dep't of Employment & Training,* 39 Mass.App.Ct. 502, 657 N.E.2d 1288, 1293 n.7 (1995), aff'd, 423 Mass. 805, 672 N.E.2d 105 (1996); *State v. Contreras,* 105 R.I. 523, 253 A.2d 612, 620 (1969)).

▬▬ A parent who is present when a child is abused but who fails to intervene to protect the child has knowingly exposed the child to, or has failed to protect the child from, abuse. The "knowing" requirement in Tenn.Code Ann. § 37–1–102(b)(21), however,

> is not limited to parents who are present when severe abuse actually occurs. A parent's failure to protect a child will also be considered 'knowing' if the parent had been presented with sufficient facts from which he or she could have and should have recognized that severe child abuse had occurred or that it was highly probable that severe child abuse would occur.

*Id.* (citing *West Va. Dep't of Health & Human Res. ex rel. Wright v. Doris S.,* 475 S.E.2d at 878–879). Accordingly, a parent's conduct is "knowing, and a parent acts or fails to act 'knowingly,' when ... she has actual knowledge of the relevant facts and circumstances or when ... she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to ... her." *In re R.C.P.,* 2004 WL 1567122, at *7.

The Department did not prove that Mother witnessed Father sexually abuse Heather or the other girls, or that Mother had actual knowledge that the abuse was occurring. There is, however, clear and convincing evidence that Mother deliberately or recklessly disregarded information she had regarding Father's prurient interest in sex, including sex with minors, that made it likely he would sexually abuse Heather and others.

The facts of this case are eerily similar to the facts in *R.C.P.* In that matter, the mother knew that the father had a prurient interest in sex, that he searched for and downloaded pornographic materials from the Internet, and that he watched pornographic videos. The mother in *R.C.P.* also knew of his sexual interests in minors, as many of the pornographic videos he watched depicted actors who were minors or appeared to be minors. *Id.* at *8. In this case, there is clear and convincing evidence that Mother knew of Father's prurient sexual interests in minors, as one of his magazines was titled "Virgin Cuties," and many of the pornographic videos he watched depicted actors who appeared to be minors. Moreover, at Father's request, Mother posed for pornographic pic-

---

**3.** The terms are defined in Tenn.Code Ann. § 39–11–106(a)(20), however, those definitions are not applicable to the case at bar. *See In re R.C.P.,* 2004 WL 1567122, at * 6 (Tenn.Ct.App. July 13, 2004) (wherein this court determined that the juvenile court erred by basing its decision on the definition of "knowing" in Tenn.Code Ann. § 39–11–106(a)(20)).

tures lying on their son's Teenage Mutant Ninja Turtle bedspread.

We also have the fact that every member of the family in Mother's home had actual knowledge of Father's sexual abuse of Heather. This was known by her six-year-old boy, her eight-year-old boy, and her ten-year-old boy. This was also known by two other minors, Amy and Ally, one of whom was sexually abused and the other raped by Father in the bedroom next to the room Mother was in when the events repeatedly occurred. Considering all of the facts of this case, it is inconceivable that all four of Mother's children would know of the actions of Father, that two other minor children who visited the home would know, and yet Mother did not recognize that abuse of Heather or others had occurred or that it was highly probable that severe child abuse would occur.

As this court concluded in *R.C.P.*, a reasonable person possessing the information that Mother possessed could only have concluded that her children needed to be protected. As was the case in *R.C.P.*, Mother deluded herself and failed to protect her children, especially Heather. By deliberately and recklessly ignoring Father's pedophilic interests, Mother knowingly failed to protect Heather from being raped by Father, and failed to protect her sons who were exposed to his acts and the sexual environment that existed in her home. We, therefore, find there is clear and convincing evidence that Mother committed severe child abuse as defined in Tenn.Code Ann. § 37–1–102(b)(21)(C). We also find there is clear and convincing evidence that the children are under such improper care when under Mother's care as to injure or endanger the children's health.

## C.

By statute, a dependent and neglected child is one who is suffering from abuse or neglect, Tenn.Code Ann. § 37–1–102(b)(12)(G); one who is in such condition of want or suffering or is under such improper guardianship or control as to injure or endanger the morals or health of such child or others, Tenn.Code Ann. § 37–1–102(b)(12)(F); or one whose parent is unfit to properly care for the child, Tenn.Code Ann. § 37–1–102(b)(12)(B). We find that the severe child abuse, the danger to the children's health, and the fact their parents are unfit have been established by clear and convincing evidence. Accordingly, we affirm the trial court's finding that the children are dependent and neglected.

### In Conclusion

The judgment of the trial court is affirmed in all respects, and this matter is remanded with costs of appeal assessed against both parents, jointly and severally.