Order Staying Litigation filed 9-25-15

# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs April 21, 2015

## IN RE AMERICUS C., ET AL.

**Appeal from the Juvenile Court of Clay County**
**No. D412014        James D. White, Judge**

_____

**No. M2014-02493-COA-R3-PT – Filed September 30, 2015**

_____

This appeal arises from the termination of parental rights to an adopted child. The boyfriend of the adoptive mother physically and sexually abused the child. Upon a petition filed by the Department of Children's Services, the juvenile court found by clear and convincing evidence that the adoptive mother had committed severe child abuse. The juvenile court also found by clear and convincing evidence that termination was in the child's best interest. The adoptive mother appeals claiming that she was not the perpetrator of the abuse and that she had not been given an opportunity to adjust her circumstances. We affirm the termination of parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Josh Hoeppner, Livingston, Tennessee, for the appellant, Tina C.

Herbert H. Slatery III, Attorney General and Reporter, and Rebekah A. Baker, Senior Counsel, Office of Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I. FACTS AND PROCEDURAL BACKGROUND

On September 20, 2013, the Department of Children's Services ("DCS") took custody of Americus C., age eight, and her two younger siblings, Montana C. and Latrell

C., ages seven and five, respectively.[1] Earlier that day, staff at the children's school came to suspect the children were being abused. Upon examination, the school nurse found Montana had a very large bruise covering her buttocks. The nurse would later testify that she had "never seen [a bruise] that extensive on a child from side to side from top to bottom . . . . It was the perfect shape of a paddle. I mean, you could tell it was a stick, paddle, something [of] that sort."

Latrell had bruising on his buttocks and back. The school nurse stated, "[I]t's obvious that it's very extensive bruising. I mean, one spanking, I don't think would do that. I think it would have to be repetitive to have that deep of bruising and that large of bruising." When school staff questioned the children separately, both Montana and Latrell attributed their bruises to "the purple paddle."

A school resource officer transported Americus, Montana, and Latrell to the Clay County Sheriff's Office for further questioning where they were later joined by their grandmother, Tina C. ("Mother"). Mother had adopted Americus and had legal custody of Montana and Latrell. The children lived with Mother and her boyfriend, Dan Newmeyer, who the children referred to as "Dad."

During her interview, Americus stated that she and her siblings had been hogtied. The children were each able to demonstrate this by lying on their stomachs and placing their hands behind their backs and lifting their feet up. Americus and her siblings had been struck by Mr. Newmeyer. Americus also heard Mr. Newmeyer threaten to kill Mother. Americus described Mr. Newmeyer as drinking every day and often smoking marijuana.

According to the child protective services case manager, during her interview, Mother corroborated the children's accounts. Mother knew that Mr. Newmeyer was physically abusing the children and that he got drunk and beat the children on a daily basis. She also admitted to spanking the children with paddles. Mother claimed to have learned two months prior that Mr. Newmeyer had been tying up Latrell. Mother also stated that Mr. Newmeyer had stabbed her with a screwdriver in the presence of the children.

The case manager also related that, during her interview, Mother expressed concerns about Mr. Newmeyer sexually abusing both Americus and Montana. Mother stated Mr. Newmeyer would constantly barge into the bathroom while Mother was giving Americus a bath. During her interview, Americus reported seeing Mr. Newmeyer staring at Montana's "private parts" while she lay nude on her bed. Mother acknowledged that Americus had made the same report to her.

---

[1] In this appeal, only the parental rights to Americus are at issue. We make reference to her younger siblings only as necessary to provide context.

A visit to the children's home on September 20 found the house, particularly Latrell's room, littered with cable or zip ties that had been fastened and cut. The school resource officer and a detective also discovered paddles, one with the name "purple pal" written on it.

Subsequent forensic interviews of the children, which revealed further potential instances of abuse, prompted another search of the home. On the follow up visit, officials discovered an area underneath the back porch closed in on three sides with wire fencing and a post with additional cable ties nailed to it. When asked if there was any evidence that a child had been kept in that area, a detective with the sheriff's office testified that he could see drawings underneath the home that appeared to be those of a child.

DCS took emergency custody of the children and ultimately placed them in foster care. A pediatric nurse practitioner, with a subspecialty of child abuse pediatrics, examined each of the children. The nurse practitioner reported several concerning skin findings on Americus. When asked about some of her healing injuries, Americus reported that Mr. Newmeyer had punched her, pushed her while she was on a bike, and cut her with a knife.

In addition to the physical injuries, Americus exhibited signs of emotional trauma, recurring nightmares, difficulty sleeping, aggressive behavior, paranoia, and hallucinations. She was diagnosed with post-traumatic stress disorder and hospitalized. To address the PTSD, Americus underwent trauma-focused cognitive behavioral therapy, including the preparation of a trauma narrative. Americus's therapist described the narrative as a story written by the patient that describes their most traumatic experience. Americus's story read, in part, as follows:

> Dan was sitting on the couch. Mom walked in. I thought, "why is she coming in here." I felt sad. Dan said, "Pull your pants down." I said "okay." I thought, why is Dan doing this. I was worried he was going to hurt me. Mom said, "Listen to Dan." I thought my mom was against me and I felt sad. I pulled my pants down and my underwear.

The story goes on to describe in detail her molestation by Mr. Newmeyer. The story also records Mother's presence and complicity. After the incident, Americus tells of Mother visiting Americus's room to explain that Mr. Newmeyer was punishing Americus for playing with her sister. Mother also warned that, next time, the punishment would be worse.

On March 7, 2014, DCS filed a petition to terminate the parental rights of Mother and the parents of Montana and Latrell in the Juvenile Court for Clay County, Tennessee.

3

The court conducted a trial on August 20, 2014. Mother appeared through counsel but was not present due to her incarceration stemming from the allegations of abuse. Only DCS presented proof. Relative to terminating the parental rights of Mother, DCS presented the testimony of the school nurse; the school resource officer; the detective with the Clay County Sheriff's office; a social services representative from Park Ridge Valley Hospital; a case manager for Therapeutic Intervention; and two DCS employees, a family services worker and the child protective services case manager. DCS also presented the deposition testimony of the pediatric nurse practitioner who had examined Americus.

Based on the testimony and exhibits, the trial court terminated the parental rights of Mother to Americus. As grounds, the court found clear and convincing evidence that Mother had committed severe child abuse as defined by statute. The court made the following findings relative to abuse:

2. The actions that constitute severe abuse are:

a. the sexual abuse and failure to protect from sexual abuse of Americus [C.];

b. the sexual abuse and failure to protect from sexual abuse of Montana [C.];

c. the physical abuse of all three children as evidenced by their statements to others and the bruises upon the children;

d. the physical abuse of Montana [C.] and [] Latrell [C.] as evidenced by their malnutrition;

e. the physical restraint of the children with zipties for lengthy periods;

f the failure to protect the children from the physical abuse of Dan Newmeyer (mother's boyfriend); and

g the restraint of the children under the front porch of the residence sometimes overnight.

The court also found clear and convincing evidence that termination of Mother's parental rights was in the best interest of Americus. In considering Americus's best interest, the court made the following additional findings:

4

1.     [Mother] has not made an adjustment of circumstances, conduct or conditions as to make it safe and in the child's best interest to be returned to her home and it appears unlikely that she would be able to do so in the near future.

2.     A change of caretaker and physical environment is likely to have a negative effect on the child's emotional, psychological and/or medical condition.

3.     Mental health professionals and caseworkers that have worked with the child have opined that it would never be safe for the child to be returned to her mother.

4.     [Mother] has committed brutality and physical, sexual, emotional or psychological abuse or neglect toward the children in her household, including her own child, by subjecting them to physical torture, nutritional neglect, and by allowing her paramour to sexually and physically abuse the children.

5.     The child needs to be released from the stigma of being a foster child.

6.     The Court does not believe, despite the fact that the child is not currently placed in a pre-adoptive home, that the mother could ever convince the Court that she has reformed to such an extent that the child could ever be safely returned to her care.

7.     The likelihood that mother will serve extensive time in incarceration due to her abuse of the children further makes it unlikely that the child could be returned in a timely manner and the permanence of the child should not be delayed pending the outcome of mother's criminal charges.

## II. ANALYSIS

Termination of parental rights is one of the most important decisions courts make. As noted by the United States Supreme Court, "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *Santosky v. Kramer*, 455 U.S. 745, 787 (1982). Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian." Tenn. Code Ann. § 36-1-113(*l*)(1) (Supp. 2013).

A parent has a fundamental right, based in both the federal and State constitutions, to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putman v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996); *In re Adoption of a Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). While fundamental, this right is not absolute. The State may interfere with parental rights, through judicial action, in some limited circumstances. *Santosky*, 455 U.S. at 747; *In re Angela E.*, 303 S.W.3d at 250.

Our Legislature has identified those situations in which the State's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth the grounds upon which termination proceedings may be brought. Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and parental rights may be terminated only where a statutory ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must determine by clear and convincing evidence the existence of a statutory ground for termination and that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). This heightened burden of proof is one of the safeguards required by the fundamental rights involved. *See Santosky*, 455 U.S. at 769. The heightened burden serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *In re Bernard T.*, 319 S.W.2d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *Id.* at 596 (citations omitted). Unlike the preponderance of the evidence standard, "[e]vidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).

Appellate courts review the trial court's findings of fact in termination proceedings *de novo* on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. "In light of the heightened burden of proof in [termination] proceedings . . . the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97.

On appeal, Mother raises two issues. She first argues the trial court erred in terminating her parental rights upon the basis that she committed severe abuse when the evidence showed that Mr. Newmeyer perpetrated the vast majority of the abuse. Mother points out she was also a victim of Mr. Newmeyer's abuse. For her second argument, Mother contends that the trial court erred in finding that termination was in Americus's best interest. Mother claims that, because she was incarcerated for the duration of the case, she had no opportunity to adjust her circumstances. Further she claims that termination of her parental rights is premature because there is still time for her to adjust her circumstances.

## A. GROUNDS FOR TERMINATION

The existence of only one statutory ground is sufficient to support a court's termination of parental rights. *In re Angela E.*, 303 S.W.3d at 251. The commission of "severe child abuse" is one such statutory ground. Tenn. Code Ann. § 36-1-113(g)(4). "Severe child abuse" is defined as follows:

> (A)(i) The knowing exposure of a child to or the *knowing failure to protect* a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;
>
> (ii) "Serious bodily injury" shall have the same meaning given in § 39-15-402(d).
>
> (B) Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, and the *knowing failure to protect a child from such conduct*.

*Id.* § 37-1-102(b)(21) (Supp. 2014) (emphasis added). "Serious bodily injury," in turn, is defined as including, but not limited to,

> second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects.

7

*Id.* § 39-15-402(d) (2012). In addition to bodily injury resulting in physical manifestations, "severe child abuse" can include unlawful sexual contact with a child under thirteen years of age or the knowing failure to protect the child from such unlawful sexual contact. *Id.* §§ 39-13-504(A)(4) (2010), 37-1-102(b)(21) (2014).

Mother concedes that Americus suffered severe abuse. She claims, however, that because Mr. Newmeyer committed the abuse and she was also victimized, the court erred in terminating her parental rights. According to Mother, "it cannot be proven by clear and convincing evidence that she knowingly perpetrated said abuse upon the child." We find such an argument unavailable for two reasons. First, evidence in the record established that Mother also abused the children by both paddling them and binding them with cable ties.[2] Second, the parent facing termination of her parental rights does not have to have caused the abuse.

The statutory definition of severe child abuse includes "the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury." Tenn. Code Ann. § 37-1-102(b)(21)(A)(i)-(B); *see In re R.C.P.*, No. M2003-01143-COA-R3-PT, 2004 WL 1567122, at *6 (Tenn. Ct. App. July 13, 2004). The rationale behind the rule is that "[p]arents have a duty to provide, and children have a corresponding right to be provided with, a safe environment, free from abuse and neglect." *In re R.C.P.*, 2004 WL 1567122, at *6. As a result, "[p]arents who have not themselves severely abused their own child may still be found to have committed severe child abuse if they knowingly exposed the child to, or knowingly failed to protect the child from, conduct constituting severe child abuse." *Id.*; *see also In re H.L.F.*, 297 S.W.3d 223, 235 (Tenn. Ct. App. 2009).

We have found a parent committed severe abuse even where there was no evidence that the parent actively engaged in or witnessed the abuse while it was occurring. *In re H.L.F*, 297 S.W.3d at 235. *In re H.L.F.* involved a father who sexually abused his daughter. *Id.* The trial court found both parents had committed severe abuse against the child based on the father's sexual abuse and mother's failure to protect her child. *Id.* In affirming the trial court, we stated, "[A] reasonable person possessing the information that Mother possessed could only have concluded that her [daughter] needed to be protected." *Id.* at 237.

In this case, even ignoring the evidence and assuming for the sake of argument that Mother committed no abuse herself, we find the evidence clear and convincing that Mother committed severe abuse by her failure to protect Americus. Mother admitted in

---

[2] According to the detective who interviewed her, Mother claimed that the children would request that she bind them because Mr. Newmeyer would do so too tightly. Mother also claimed that she would bind the children with their hands in front of them, but she later conceded that she would also bind their hands behind their back.

her interview that she knew that Mr. Newmeyer abused the children on an almost daily basis. Just as in *In re H.L.F.*, a reasonable person in Mother's position would have concluded that her children needed to be protected. Although she might have feared Mr. Newmeyer's reaction if she reported the abuse, Mother had opportunities to seek protection for her children.[3] The record also indicated that, only five days prior to the school discovering the abuse, Mother had kicked Mr. Newmeyer out of the house.

## B. BEST INTEREST OF AMERICUS

The focus of the best interest analysis is on what is best for the child, not what is best for the parent. *In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005); *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). In evaluating whether termination of parental rights is in a child's best interest, courts consider a list of non-exclusive statutory factors. Tenn. Code Ann. § 36-1-113(i) (2010). Not every factor enumerated in the statute applies to every case because the facts of each case can vary widely. *See In re Audrey S.*, 182 S.W.3d at 878.

After considering the applicable statutory factors, the juvenile court determined that it was in Americus's best interest to terminate Mother's parental rights. Mother asserts that the trial court erred in its finding given that she was incarcerated for the duration of the case and thus had no opportunity to adjust her circumstances. She also claims that termination of her parental rights will do nothing to relieve Americus from the stigma of foster care given that adoptive parents have not yet been identified for the child. In effect, Mother argues that there is still time for her to make an adjustment in her circumstances that would allow her to eventually parent Americus.

We find both of Mother's arguments unavailing. As for the first argument, Mother looks at the best interest analysis from her perspective. As we have noted previously, "[t]he child's best interests must be viewed from the child's, rather than the parent's, perspective." *Id.* Although Mother may not be "irredeemable," *see White*, 171 S.W.3d at 193, and in time an adjustment of her circumstances may be possible, the record is clear that Americus suffered and suffers greatly from the abuse she endured. Her therapist, an expert on child welfare, and a DCS social worker both testified that it would never be safe for Americus to return to Mother.

As for the second argument, "Tennessee law requires only that an adoption be contemplated at some point in the future." *In re Audrey S.*, 182 S.W.3d at 879. Any "stigma" associated with Americus's stay in foster care will be far outweighed by the opportunity for her to heal in a healthy and safe home.

---

[3] According to the detective who interviewed her, Mother reported that Mr. Newmeyer had moved out of the house to return to Ohio on several occasions.

9

The juvenile court correctly concluded that the applicable statutory factors weighed heavily in favor of terminating Mother's parental rights. Neither of the considerations raised by Mother convinces us to the contrary.

### III. CONCLUSION

We conclude that there is clear and convincing evidence of one statutory ground to terminate Mother's parental rights. We also conclude that there is clear and convincing evidence that termination is in the best interest of Americus. Therefore, we affirm the judgment of the juvenile court.

_____
W. NEAL McBRAYER, JUDGE