IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 2, 2011 Session

IN RE NIRVANNA S.

Appeal from the Law Court for Sullivan County
No. C13780      John S. McLellan, III, Judge

No. E2010-01358-COA-R3-JV - Filed February 28, 2011

This is a dependent and neglected case concerning Nirvanna S. ("the Child"), the minor child of Heather S. ("Mother") and Mark S. ("Father"). Following the death of the Child's infant sister, the Department of Children's Services ("DCS") filed a petition in juvenile court alleging that, in the care of Mother and Father, the Child was dependent, neglected and severely abused. The juvenile court held an adjudicatory hearing and determined that the Child was dependent and neglected – but not severely abused – by her parents. The juvenile court awarded temporary custody of the Child to DCS and charged the department with undertaking reasonable efforts toward reunifying the Child with Mother and Father. DCS appealed the order to the trial court. Following a bench trial, the court found that both parents had committed severe abuse against the Child's sister pursuant to Tenn. Code Ann. § 37-1-102(b)(23)(A) and that the Child was dependent and neglected and "severely abused" within the meaning of the law. The court ordered DCS to retain custody of the Child; it relieved DCS of its obligation to work toward reunifying the Child with Mother and Father. Mother appeals.[1] Following our review, we modify that part of the trial court's opinion finding that the Child was "severely abused." In all other respects, the judgment is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Law Court
Affirmed as Modified; Case Remanded**

CHARLES D. SUSANO JR., J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

---

[1]Father was a party to the proceedings below and filed a timely appeal, but it was subsequently dismissed on his motion. Accordingly, Father is not a party to this appeal and we refer to him only as is necessary to relate the underlying facts.

Katherine L. Tranum, Kingsport, Tennessee, for the appellant, Heather S.

Robert E. Cooper, Jr., Attorney General and Reporter and Alexander S. Rieger, Assistant Attorney General, Office of the Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I.

Father and Mother are the married parents of two children – the Child, born on February 27, 2007, and her late sister, Dreama, born on December 1, 2008. Mother worked extended hours as a cake decorator for Food City, while Father stayed home and cared for the children.

On the afternoon of April 23, 2009, emergency medical providers responded to a call of an infant in cardiac arrest at the family's home. They arrived to find four-month-old Dreama laying unconscious on the kitchen floor with Father attempting to perform CPR. Father offered only that he had found the infant not breathing. An EMS technician noted a bluish color around Dreama's earlobes and fingernails. This indicated to the technician that the infant had not been breathing for some 30 minutes to an hour. Emergency personnel briefly attempted to revive her, without success, before transporting her to the hospital, where she was pronounced dead shortly after her arrival. Father had brought the Child to the hospital with him and called Mother, who arrived soon afterwards. She was "distraught" and "inconsolable" when she learned that Dreama had died. While at the hospital, the Child also underwent a physical examination and x-rays, the results of which showed no signs of abuse.

Dr. Kelly Chumbley saw Dreama at the emergency room and conducted the postmortem examination. Initially, he observed bruises, old and new, on several areas of her body, as well as torn rectal tissues. Based on his physical findings, Dr. Chumbley ordered a full body x-ray that revealed numerous broken bones including multiple broken ribs and numerous leg and other fractures. He opined that the leg fractures "represent that the child was violently shaken or whipped from side to side as one part of the leg or the joint was . . . held . . . ." Dr. Chumbley noted his impressions of "cardiopulmonary arrest [of] questionable etiology" and child abuse. Dreama's case was referred for further investigation to the sheriff's department and Child Protective Services ("CPS").

Over the next several hours, Detective Georgian Pascue took four statements from Mother. Therein, Mother denied the possibility that she or Father had ever hurt Dreama, but admitted seeing bruises on the infant and was aware that Dreama's legs were hurting her.

Mother further stated that both children slept in the same bed with her and Father and Father had rolled over onto Dreama. In his statement, Father denied inflicting injury on Dreama but admitted that he was her primary caregiver and offered no explanation for or other possible source of her injuries. Both Mother and Father admitted to nearly daily use of marijuana and to being "busted" for attempting to manufacture methamphetamine. Upon searching the family's single-wide mobile home on the day Dreama died, detectives found that it was cluttered with dirty dishes and baby bottles throughout the kitchen and clothes and other items strewn about. They found evidence of drug use in the kitchen and master bedroom.

Dr. Marianne Neal, a board-certified pediatric radiologist, further examined Dreama's postmortem x-rays. Her review revealed that Dreama had sustained a total of 14 broken bones to include seven fractured ribs, bilateral femur fractures, bilateral tibia and fibula fractures, a left radial fracture and an acute right ulnar fracture. The fractures were in a healing stage, meaning they were more than seven days to ten days old, except for the broken right forearm which showed no evidence of healing. Dr. Neal concluded that the leg fractures were "consistent with a shaking injury"and "highly specific for non-accidental trauma." Similarly, the rib fractures were "very commonly seen in cases of non-accidental trauma due to shaking, grasping the thorax while shaking." Dr. Neal opined that the fractures could not have been cause by Dreama herself or by the Child trying to lift her. A CT scan further revealed split sutures to the skull that were a secondary sign of swelling in the brain resulting from "an acute single incident" such as "strangulation, suffocation, lack of oxygen to the brain."[2] With respect to the bruises across the infant's lower back, buttocks, and external labia, Dr. Neal noted that some were new and others fell within a range of being two days to a week old. She concluded the injuries occurred during a "minimum" of two separate incidents.

In the evening hours after Dreama died, DCS removed the Child from the home and agreed to Mother's request that the Child be permitted to stay temporarily with Mother's father. A "no-contact" agreement prohibited Father from being around the Child. CPS investigator Cathy Agnew accompanied the Child and Mother to the house of Mother's father, and Father arrived soon after them with clothing and other items for the Child. Agnew noted that, although Mother was permitted to stay with the Child, she left with Father for the night.

An adjudicatory hearing was held on DCS's petition in October 2009. In summary, the juvenile court found, by clear and convincing evidence, that

---

[2]The autopsy report is not in the record before us, however, at trial, counsel referred to it as stating the cause of Dreama's death as "suffocation as a result of co-sleeping."

the [C]hild . . . is dependent and neglected within the meaning of the law; that it is contrary to the [C]hild's welfare to remain in the care, custody, or control of her parents; that it was not reasonable or in the [C]hild's best interest to prevent removal; that [DCS] did not prove that either parent committed severe abuse as to [the Child], and that the State is not relieved from making reasonable efforts; . . . .

The juvenile court awarded temporary custody to DCS and further ordered continued visitation with Mother and Father. The Child was subsequently removed from the home of relatives and entered foster care.

On DCS's appeal, a trial de novo was held on May 27, 2010. Mother testified that she worked eight to ten hour shifts of over forty hours a week. In the evenings, she cared for the children by bathing, feeding and playing with them before bedtime. After Father had rolled over onto Dreama two or three times, she moved the baby to the other side of the bed. Mother stated she sent Father to the doctor's office with Dreama and told Father to ask about her leg. Father reported back that the doctor found nothing wrong. Questioned further, Mother said it would not surprise her to learn that, according to the doctor, Father had never asked him anything about Dreama's leg; Mother agreed that either Father or the doctor was lying. Asked whether she could tell when Dreama was crying in pain, Mother began crying and replied "I thought she really (inaudible) was when I'd lift her leg to change her diaper." She acknowledged that she knew something was wrong with the infant's leg and "knew that she'd been bruising easily." Mother admitted making statements to the effect that Father was too rough with Dreama.[3] When asked to explain her statement, Mother exercised her Fifth Amendment privilege against self-incrimination. She agreed however, that she had sometimes taken Dreama to her mother's house when she thought Father might have been too rough with the baby. Mother said she would do anything to regain custody of the Child.

Carrie Marchant, an in-home parenting services provider, drove the Child back and forth from her foster home for her therapeutic visitations at Marchant's Blountville office. On January 16, 2010, she was at the Child's foster home working with her foster family when the Child blurted out, "My daddy hit my sister, and I told him to stop, stop, stop." Later that month, Marchant was driving the Child back home from a therapeutic visit and a trip to McDonald's when the Child suddenly stated, "Carrie, Carrie, Carrie, my daddy hit Dreama, and my mommy was upset."

---

[3]It is not clear to us when or to whom Mother admittedly made such a statement; it is not contained in the recorded statements she made to Detective Pascue.

Summer Seals, a long-time friend of Mother's, often allowed her son to play with the Child under Father's supervision and had no concerns about Father. Seals had seen Dreama three or four times and described her as a "normal, happy baby that just . . . laid there. . . ." Seals once observed a small bruise or mark on Dreama's face that did not concern her, but she did ask Mother about it, who said she "wasn't for sure how she got it," but was worried that the Child might have hurt Dreama while playing.

At the close of the proof, both Mother and Father, through their separate counsel, conceded that the Child was dependent and neglected pursuant to Tenn. Code Ann. § 37-1-102(b)(12)(B)[4] based on her being exposed to drugs and environmental neglect. With respect to Mother, the trial court found, by clear and convincing evidence, that Mother committed severe child abuse against Dreama by failing to protect her and that the Child, as a result of the abuse Dreama suffered, was "severely abused" under the law. Based on its findings, the court relieved DCS from making reasonable efforts to reunify the Child with Mother (and Father)[5]. Because of Mother's disagreement with the trial court's "reasonable efforts to reunify" decision, she appealed.

II.

Mother raises multiple issues for our review that we combine and restate them as follows:

> 1. The evidence is insufficient to support the trial court's finding that Mother committed severe child abuse against the Child's sibling.
>
> 2. The trial court erred in finding that the Child was severely abused by imputing to the Child the severe abuse sustained by her sibling.

---

[4]Tenn. Code Ann. § 37-1-102(b)(12)(B) provides that " 'Dependent and neglected child' means a child: . . . (B) Whose parent, . . . with whom the child lives, by reason of cruelty, mental incapacity, immorality or depravity is unfit to properly care for such child;"

[5]At the time of the trial, Father was incarcerated on charges of aggravated child abuse against Dreama.

III.

This Court has addressed the standard of review in cases involving allegations of dependency and neglect and severe child abuse as follows:

> Whether the ultimate issues of dependency and neglect or severe child abuse have been established by clear and convincing evidence are questions of law, which we review de novo with no presumption of correctness. To the extent the trial court made findings of fact in support of the ultimate issues, we review the factual findings pursuant to Tenn. R. App. P. 13(d), de novo with a presumption of correctness unless the evidence preponderates otherwise. Therefore, this court will review the trial court's specific findings of fact in support of its ultimate conclusions de novo, pursuant to Tenn. R. App. P. 13(d), with a presumption of correctness; however, we will review those conclusions of law, that the parents engaged in severe child abuse and that the [child] [is] dependent and neglected, de novo with no presumption of correctness.

*In re H.L.F.*, 297 S.W.3d 223, 233-34 (Tenn. Ct. App. 2009).

IV.

At trial, Mother conceded that the Child was dependent and neglected under Tenn. Code Ann. § 37-1-102(b)(12). On this appeal, she does not contest the sufficiency of the evidence in this regard. Instead, Mother focuses on the findings of the trial court of severe abuse to both of her children – findings that meant DCS is absolved of the obligation to make reasonable efforts to reunify the Child with Mother.

Mother first challenges the trial court's finding that she committed severe abuse against Dreama. Tenn. Code Ann. § 37-1-102(b)(23)(A) defines "severe child abuse" in relevant part, as follows:

> The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause great bodily harm or death and the knowing use of force on a child that is likely to cause great bodily harm or death;

This court has elaborated upon the "knowing" element of the "severe abuse" definition as applied in dependent and neglected cases and other proceedings involving juveniles. In *In re H.L.F.*, 223 S.W.3d at 235-36, we stated:

> [P]arents have a duty to provide, and children have a corresponding right to be provided with, a safe environment, free from abuse and neglect. Accordingly, a parent who has not directly abused her own child may still be found to have committed severe child abuse if she "knowingly exposed the child to, or knowingly failed to protect the child from, conduct constituting severe child abuse."
>
> "Knowing" and "knowingly" are not defined in Tenn. Code Ann. § 37-1-102, or in any other statute pertaining to dependency and neglect proceedings to terminate parental rights or in other civil proceedings involving juveniles. The words "knowing" and "knowingly" do not have fixed or uniform meanings, and their meanings vary depending on the context in which they are used or the character of the conduct at issue.
>
> A parent who is present when a child is abused but who fails to intervene to protect the child has knowingly exposed the child to, or has failed to protect the child from, abuse. The "knowing" requirement in Tenn. Code Ann. § 37-1-102(b)(21), [now contained in subsection (23)], however, is not limited to parents who are present when severe abuse actually occurs. A parent's failure to protect a child will also be considered "knowing" if the parent had been presented with sufficient facts from which he or she could have and should have recognized that severe child abuse had occurred or that it was highly probable that severe child abuse would occur. Accordingly, a parent's conduct is knowing, and a parent acts or fails to act "knowingly," when . . . she has actual knowledge of the relevant facts and circumstances or when . . . she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to . . . her.

(Internal citations omitted).

Returning to the present case, the trial court made detailed findings of fact regarding the abuse against Dreama. We quote extensively from its opinion:

> [Father] caused the . . . multiple fractures, bruises and cerebral edema which resulted in suffering by [Mother's and Father's] child, Dreama . . ., as a result of severe child abuse as defined in T.C.A. § 37-1-102(b)(23)(A).
>
> [Mother] was aware of fingerprint like bruises on Dreama's ribs for the period of two months to two weeks prior to the child's demise; took the child on occasion to her mother's due to the bruises on Dreama; "stayed up" on the fingerprint bruises on Dreama as she acknowledged that [Father] was a strong man; noticed the baby Dreama had blood on her nose after Easter preceding her demise; was aware that something was wrong with Dreama's leg as she cried when lifting the leg; allowed Dreama to sleep between her and [Father] and was aware that two to three times [Father] had rolled over on the child, causing a danger to the baby and only then relocated the child to another part of the bed; used marijuana or other drugs on an almost daily basis and was aware that [Father] who was the primary caretaker used marijuana or other drugs on a daily basis.
>
> [The Child] on January 16, 2010, reported to a parenting instructor that she had told [Father] to stop hitting her sister and told him to "stop, stop, stop," and later that month stated to the parenting instructor that [Father] hit Dreama and that her mommy got upset.
>
> [Mother], mother of Dreama and [the Child], failed to protect Dreama [ ] from abuse and neglect likely to cause great bodily harm within the meaning of T.C.A. § 37-1-102(b)(23)(A). A parent who knowingly permits severe abuse is as culpable as a person who inflicts such abuse. Reasonable efforts of the type described in T.C.A. § 37-1-166(g)(1) are not required to be made where a parent has subjected [the Child] to "aggravated circumstances" as defined in T.C.A. § 36-1-102(9). Although [Mother] was not always present when severe abuse occurred, her failure to protect a child is "knowing" when there are sufficient facts from which the children's mother could have and

-8-

should have recognized that severe abuse by her husband had occurred or that it was highly probable that severe abuse would occur.

The Court finds by clear and convincing evidence that [the Child] is severely abused by [Mother and Father] within the meaning of the law; that [Mother] knowingly failed to protect the infant sibling of the [C]hild subject to this petition; that [Mother] has sufficient evidence that severe abuse had occurred or was highly probable to occur to Dreama, . . . ; that it is contrary to the [C]hild's welfare to be returned to the care, custody or control of her parents; that [DCS] has proven that both parents committed severe abuse as to the [C]hild; and that the State is relieved from making reasonable efforts to reunite the [C]hild with [Mother and Father]. . . .

Mother insists that she did not knowingly fail to protect Dreama from the severe abuse inflicted upon her. She emphasizes that, only weeks before the infant died, "[Mother] took [Dreama] to the pediatrician's office on April 1, 2009 for a physical examination,"and the pediatrician found "nothing wrong." She further points to testimony by Dr. Neal that Dreama's injuries may not have been readily apparent to an observer and would not necessarily have included visible signs that the child was in pain, such as crying, unless she was moved a certain way. Mother insists that the evidence at trial failed to show that she knew or should have known that Dreama was being abused or that she deliberately or recklessly chose to ignore signs which should have led her to this conclusion. We think the evidence shows otherwise.

Perhaps most damaging to Mother's position – that her failure to take protective action on Dreama's behalf was not "knowing"– are certain admissions Mother made in her statements to Detective Pascue in the hours just after Dreama's death. We recite portions of Mother's statements as follows:

4/23/09
15:30

As far as I know [Dreama] has never been hurt in any way. God No. I have no idea[.] I can't understand how my baby was alive yesterday and dead today[.]

-9-

4/23/09
16:00

One time I took the baby to the doctor because her legs were hurting two months ago, she had bruises on her ribs two months ago. No one has been around the baby besides my mom that was about two weeks ago, [Father] was sick and mom took care of the baby. I started taking the baby to my mom[']s house. because Dreama always wanted to be held. that just lasted about a week. [Father] said he didn't know how Dreama got bruises on her ribs, I saw them I saw finger print like bruises on her ribs and the sides. that . . . one time . . . was the only one time I've seen bruises two weeks ago. I've never seen [Father] get made at Dreama.

*   *   *

Me and my husband got busted for a Meth lab. We use marijuana, both of us. [Father] would never do anything to the kids, [Father] is a good dad.

4/23/09
16:45

I have noticed bruises on [Dreama] and I've been raising Hell with [Father] because I've been staying up on it. To make sure there were no bruises I had taken her to my moms to help [Father] because I figured if she was getting hurt that [Father] didn't need to have them both. [Father] carries her around[.] [Father is] a strong man and I didn't think he would hurt Dreama by carrying her around.

4/23/09
19:20

There is no way for me to give you specific dates but it was around Easter, right after Easter. Dreama had blood on her nose. I came home and asked [Father] what happened and he said he went to the bathroom and [the Child] was in the living

room with Dreama(,) standing over her. [The Child] tries to get sissie's buggers.

Turning to the medical evidence, Dr. Andrew Brockmyre, Dreama's pediatrician, attended to her since her birth. He last saw her when Father brought her to his office on April 1, 2009, and he performed a "complete head to toe physical." More specifically, he checked Dreama's head, eyes, ears, throat, collar bones, heart, lungs, abdomen, hips and skin and found no abnormalities or bruises. Dr. Brockmyre stated that Father did not ask him to check for any problem with Dreama's legs. Dr. Brockmyre was "pretty certain" he would have detected fractures of the type present at Dreama's death if they were present on her April 1 visit. In particular, the leg fractures would have been "most obvious" because in checking her hips, "you'd have to grab the baby in the legs, and kind of test their hip joints, and it would have been pretty obvious if there was a problem there . . . , if there was a fracture . . . it, not only would the exam have been abnormal, but . . . it would have been very painful for her." Moreover, there might have been bruising and abnormal sounds in the lungs as a result of the broken ribs. Dr. Brockmyre concluded, to a reasonable degree of medical certainty, that the fractures would have been detected and still painful to Dreama even if they had begun to heal at the time of his April 1 examination.

Next, Dr. Neal stated that a child with Dreama's injuries may or may not have significant outward signs of injury such as crying or bruising "as long as the patient is quiet and not moving those extremities." She concluded it was possible for a child to have such injuries and it not be apparent to an observer. Dr. Neal further testified, however, that "even an individual fracture would cause pain if the extremity were moved, or the ribs were touched."

Dr. Chumbley concluded that Dreama would have suffered from her rib fractures because, in his opinion, anything that "expands or contracts or touches that chest wall is going to cause excruciating pain." He added that "simply rolling over on a child, that's not enough force to break these ribs." He concluded that these were "injuries inflicted on this child" that would have been extremely painful to her – "excruciating to say the least."

Considering the evidence in its entirety, it is possible all of the injuries Dreama sustained may not have been present when Father took Dreama for a physical three weeks before she died. At some point, however, while Mother cared for Dreama every night, bathed her, changed her diapers, held and played with her, the injuries were present. She noticed bruises on the baby and heard her cry out in pain when her leg was moved and suspected "something was wrong" with her. Moreover, Mother professed that she had been staying up on the situation about the bruises, "raising Hell" with Father and had questioned him about them. A few times she had even taken Dreama to her mother's because she felt

-11-

that Father was too rough with her. On most days, however, Mother went to work and left Father to care for the baby despite her unexplained concerns. When asked to explain why she thought Father may have been "too rough" with Dreama, Mother invoked her right against self-incrimination when asked to explain what "too rough" meant.

Armed with signs that Dreama was getting hurt while in Father's care and was in pain, the only action Mother took was to send Dreama to the doctor's office with Father with instructions that Father ask about her leg. When Father returned and reported the doctor found "nothing wrong" with Dreama, Mother accepted his assertion despite her admission at trial that she would not be surprised to learn that, according to the doctor, Father had never asked about Dreama's leg. No less significant, Mother admitted to seeing "finger print [sic] like bruises" on the baby's sides but aside from questioning Father, did nothing with this information. Lastly, the Child reported witnessing Father hitting Dreama and said Mother was upset about it.

In summary, the evidence does not preponderate against the trial court's finding that Mother had sufficient information that severe abuse to Dreama had occurred or would occur but knowingly failed to take appropriate action to protect her. The trial court did not err in its conclusion that Mother thereby committed severe child abuse against Dreama.

V.

Mother asserts that the trial court further erred in finding that the Child was severely abused by imputing to her the abuse committed against Dreama. As quoted earlier in this opinion, the trial court found that "both parents committed severe abuse as to [the Child. . . ." Upon our review of the evidence, we agree with Mother's position. There was no evidence at trial even remotely suggesting that the Child herself was subjected to direct abuse of any kind. We think it is clear from the trial court's opinion that it found the Child was subjected to "severe abuse" based on the injuries inflicted on Dreama and the fact that, by the Child's own account, the Child actually witnessed Father abusing her sister.

In response to Mother's argument, the State essentially concedes error by the trial court. Counsel for DCS states:

> The Department is unaware of any statute or statutory definition in a dependency and neglect proceeding that permits the trial court to declare a child severely abused solely based on a court's finding that the child's sibling was severely abused. There is no evidence that [the Child] herself suffered severe child abuse.

-12-

Thus, this brief will not defend the trial court's finding that [the Child] suffered severe child abuse.

Following our independent research, we agree with DCS's position that there is no statutory authority that would allow a child who was not subjected to conduct constituting "severe child abuse" to be deemed a severely abused child based on abuse perpetrated against a sibling. We must conclude that the trial court erred in its factual conclusion that the Child "is severely abused by [Mother and Father] within the meaning of the law. . . ." For this reason, we modify the law court's opinion so as to affirm its finding of severe child abuse by Mother only as to Dreama; the finding of severe abuse by Mother as to the Child is not supported by the evidence and is hereby rejected. Based on the foregoing, we conclude that DCS correctly concedes this issue.

Our disposition of this issue notwithstanding, we take this opportunity to point out that the trial court's order relieving DCS of any efforts to reunify the Child with Mother remains unchanged. The following statutes are relevant in this regard:

Tenn. Code Ann. Sec. 37-1-166 provides, in relevant part, as follows:

> (a) At any proceeding of a juvenile court, prior to ordering a child committed to or retained within the custody of the department of children's services, the court shall first determine whether reasonable efforts have been made to:
>
> (1) Prevent the need for removal of the child from such child's family; or
>
> (2) Make it possible for the child to return home.
>
>       \*   \*   \*
>
> (g) (1) As used in this section, "reasonable efforts" means the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family. In determining reasonable efforts to be made with respect to a child, as described in this subdivision (g)(1), and in making such reasonable efforts, the child's health and safety shall be the paramount concern.

(2) Except as provided in subdivision (g)(4), reasonable efforts shall be made to preserve and reunify families:

(A) Prior to the placement of a child in foster care, to prevent or eliminate the need for removing the child from the child's home; and

(B) To make it possible for a child to safely return to the child's home.

\* \* \*

(4) *Reasonable efforts* of the type described in subdivision (g)(2) *shall not be required to be made with respect to a parent of a child* if a court of competent jurisdiction has determined that:

(A) *The parent has subjected* the child that is the subject of the petition or *any sibling* or half-sibling *of the child who is the subject of the petition* or any other child residing temporarily or permanently in the home *to aggravated circumstances as defined in § 36-1-102*;

(Emphasis added).

Section 36-1-102(9), referenced above, defines "aggravating circumstances" as follows:

"Aggravated circumstances" means abandonment, abandonment of an infant, aggravated assault, aggravated kidnapping, especially aggravated kidnapping, aggravated child abuse and neglect, aggravated sexual exploitation of a minor, especially aggravated sexual exploitation of a minor, aggravated rape, rape, rape of a child, incest, *or severe child abuse, as defined at § 37-1-102;*

Tenn. Code Ann. § 36-1-102(9) (emphasis added).

As can be seen, Mother's severe abuse of the Child's sibling, *i.e.*, her "knowing failure to protect" the sibling, is an "aggravating circumstance" that relieves DCS of its obligation to work toward reunifying the Child with Mother.

-14-

VI.

The judgment of the trial court is affirmed as modified. Costs on appeal are taxed to the appellant, Heather S. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the court's judgment and the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE