IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 7, 2013

IN RE  TAYLOR H. ET AL.

Appeal from the Juvenile Court for Loudon County
No. 11-JV-940      Rex A. Dale, Judge

No. E2012-01818-COA-R3-PT-FILED-MAY 22, 2013

This is a termination of parental rights case focusing on the four minor children ("the Children") of mother, Kelly H. ("Mother") and father, Bernard H. ("Father"). A termination petition was filed by the Tennessee Department of Children's Services ("DCS") after the third custody episode involving these parents. The petition alleges the sole statutory ground of severe child abuse.  Following a bench trial, the trial court granted the petition upon its finding, by clear and convincing evidence, that Mother and Father had committed severe child abuse pursuant to Tennessee Code Annotated § 36-1-113(g)(4) and § 37-1-102. The court further found, by clear and convincing evidence, that termination of parental rights was in the Children's best interest.  Father has appealed.  We affirm.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded

THOMAS R. FRIERSON, II, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and D. MICHAEL SWINEY, J., joined.

Andrew Pate, Knoxville, Tennessee, for the appellant, Bernard H.

Robert E. Cooper, Jr., Attorney General and Reporter, and Mary Byrd Ferrara, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

OPINION

I.  Factual and Procedural Background

Mother and Father have four minor children: Taylor, now age eleven; Tyler, age six;

Tori, age five; and Thomas James or "T.J.," age three. The oldest three Children were placed in DCS custody in 2008 due to Mother's and Father's drug abuse and housing issues. The parents completed drug rehabilitation and regained custody in September 2009. In 2010, when T.J. was approximately one year old, he was taken to the hospital after choking on a popcorn kernel. He was intubated, and the kernel was removed. Tragically, he suffered a severe brain injury due to a sustained lack of oxygen. He has suffered from profound health problems since that incident. T.J. is considered a medically fragile child with serious respiratory issues and frequent seizures. The child is fed via a feeding tube, requires frequent suctioning of mucus secretions, is unable to communicate, and is completely dependent on others to fulfill his most basic needs.

In October 2010, all four of the Children were placed in DCS custody due to concerns over the parents' ongoing drug issues and whether T.J. was receiving proper care. T.J. was placed in a foster home with a caregiver who was medically trained and could provide appropriate care for his needs. The other Children were placed together in a separate foster home. The parents regained custody in May 2011. Thereafter, the parents and all four Children moved into a mobile home owned and occupied by Mother's stepfather.

On June 8, 2011, DCS received an anonymous telephone communication wherein the caller reported that the parents were taking T.J.'s medication.[1] DCS, accompanied by police officers, went to the home to investigate. These authorities found the living conditions in the area of the home occupied by the parents and Children to be deplorable. They also observed an unmarked bottle of mixed pills in a location accessible by the Children. Evidence clearly showed that someone had been smoking cigarettes in close proximity to T.J.'s oxygen tanks. Thereafter, Father and Mother were screened for drug usage. Both parents tested positive, with Father presenting levels of THC and methadone and Mother indicating the presence of THC, methadone, and benzodiazepines. As T.J. was deemed to be in need of medical attention, he was transported to the hospital and admitted.

By Order of the Juvenile Court, the Children subsequently were returned to foster care. T.J. was placed again in the medically fragile foster home that had previously provided for his care. The siblings, Taylor, Tyler, and Tori, were placed together in a different foster home. DCS filed the instant petition seeking termination of both parents' parental rights after the Children had been in foster care for about eighteen months. The trial on the merits was held over the course of three days. Neither parent appeared for the hearing despite having received proper notice. Both parents' counsel appeared for trial, however, and the proceedings went forward in the parents' absence.

---

[1] T.J. had been prescribed Klonopin, a benzodiazepine, for seizures.

Following the trial, the trial court made extensive findings of fact. The court specifically determined that the statutory ground of severe child abuse had been proven by clear and convincing evidence, and the court concluded that there was clear and convincing evidence that termination of parental rights was in the Children's best interest. The court accordingly terminated both Mother's and Father's parental rights. Only Father filed a notice of appeal.

## II. Issues Presented

Father presents two issues for our review, which we have restated as follows:

1.     Whether the trial court properly concluded that Father engaged in severe child abuse so as to support termination of his parental rights pursuant to Tennessee Code Annotated §36-1-113(g)(4).

2.     Whether the trial court properly concluded by clear and convincing evidence that it was in the best interest of the Children to terminate Father's parental rights.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *Id.*; Tenn. R. App. P. 13(d). Questions of law, however, are reviewed *de novo* with no presumption of correctness. *In re Bernard T.*, 319 S.W.3d 586 (Tenn. 2010). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). As our Supreme Court has instructed:

In light of the constitutional dimension of the rights at stake in a termination proceeding under Tenn. Code Ann. § 36–1–113, the persons seeking to terminate these rights must prove all the elements of their case by clear and convincing evidence. Tenn. Code Ann. § 36–1–113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The purpose of this heightened burden of proof is to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights. *In re Tiffany B.*, 228 S.W.3d 148, 155 (Tenn. Ct. App. 2007); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005). Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings. *In re Valentine*, 79 S.W.3d at 546; *State, Dep't of Children's Servs. v. Mims* (In re N.B.), 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008).

*In re Bernard T.,* 319 S.W.3d at 596.

## IV. Severe Child Abuse

The trial court terminated Father's parental rights on the statutory ground that he committed severe child abuse. Tennessee Code Annotated § 36-1-113(g)(4) (Supp. 2012), as relevant to this action, provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

* * *

(4) The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of

> such child, or any other child residing temporarily or permanently in the home of such parent or guardian . . . .

Tennessee Code Annotated § 37-1-102(b)(23) (Supp. 2012) defines "severe child abuse," in relevant part, as:

> (A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death . . . .
>
> As this Court has previously explained:
>
> a parent's conduct is "knowing, and a parent acts or fails to act 'knowingly,' when . . . [he] has actual knowledge of the relevant facts and circumstances or when . . . [he] is either in deliberate ignorance of or in reckless disregard of the information that has been presented to . . . [him]."

*In re H.L.F.*, 297 S.W.3d 223, 236 (Tenn. Ct. App. 2009), quoting *In re R.C.P.*, No. M2003-01143-COA-R3-PT, 2004 WL 1567122 at *6 (Tenn. Ct. App. July 13, 2004).

The trial court made extensive findings regarding the witnesses' testimony at trial, expressly determining each lay witness to be credible and Dr. Mary Palmer to be an expert in pediatrics. Father did not testify during trial. Both officers from the Lenoir City Police Department ("LCPD") who entered the home where the parents were living with the Children described the environment as smoky and unclean. Officer Arnwine testified that Mother appeared to be under the influence and "out of it." The officer confiscated an unlabeled bottle of mixed pills from the kitchen, which container was in easy reach of the Children. As described by the officer, cigarette butts were present everywhere, and clutter made it difficult to walk in the room where T.J. was located.

Vickie Fox, an investigator for Child Protective Services, also provided testimony concerning both the home environment and the parents' use of drugs. She stated that the rooms where the family was living were "deplorable," presenting a heavy odor of smoke. Father told Ms. Fox he had spilled T.J.'s Klonopin prescription in the sink and that he had been substituting Mother's Klonopin by cutting it into fourths and administering it to the child. Ms. Fox related that both parents failed the drug screens administered to them that day. As Ms. Fox further testified, Mother admitted she had taken a Klonopin and that this was the benzodiazepine revealed by the drug test.

Ms. Watkins, the forensic interviewer for the Children's Advocacy Center, testified that when the Children were interviewed, Taylor related that both parents smoked inside the house. Likewise, Tyler informed Ms. Watkins that he had seen the parents use drugs and take shots in their armpits. Charles A., Mother's stepfather, also testified, explaining that the parents slept in the same bed with T.J., smoked inside the home, and slept frequently without taking sufficient care of the Children. Charles A. specifically testified regarding an incident wherein one of T.J.'s medical monitors signaled loudly for about ten minutes. When Charles A. entered the room, both parents were "passed out" and very difficult to awaken. Timothy Bickwell, a respiratory therapist from the medical equipment company, was also called to testify, indicating that he warned both parents not to smoke around T.J.'s oxygen canisters due to the risk of fire and/or explosion.

Taylor, age ten at the time of trial, testified that when she lived with Mother and Father, they were usually asleep or "passed out on drugs" and could not be awakened. The child previously had seen her parents snort drugs and put shots in their arms. At times she had to prepare food for herself and her siblings when they were hungry. Taylor indicated that she did not want to live with her parents because they did not take care of her or her siblings.

The trial court also considered the deposition testimony of Dr. Mary Palmer, and found as follows:

> Dr. Mary Palmer, physician at East Tennessee Children's Hospital, whom the Court finds to be an expert in pediatrics, testified as to [T.J.'s] medical condition[s] and their cause by deposition taken on March 28, 2012; said deposition was admitted as an exhibit to the proceeding; Dr. Palmer testified that the child suffered extreme brain damage after choking on a popcorn kernel in July 2010; that in August 2010 the child was extubated, remained stable and was discharged with a feeding tube and nursing visits; that in October 2010 the child was hospitalized for brain and respiratory issues; that on June 8, 2011, the child was admitted to the hospital due to respiratory distress, increased seizure[s] and a feeding tube was placed; that the child's drug screen showed no Klonopin in his system; that more than 3 days had passed since that medication had been given based upon those drug screen results; that she is familiar with the [parents'] drug use issues; that the parents were getting drugs on the street and from other physicians and providing them to the child; that smoking exacerbates [T.J.'s] lung condition and can lead to serious bodily injury or death due to the possible explosion of the oxygen canisters; and that the parents co-sleeping with [T.J.] has the danger of overlying which could lead to serious bodily injury or death for the child.

Based on the totality of the testimony, the trial court determined that the statutory ground of severe child abuse had been proven by clear and convincing evidence. We agree. The evidence, including testimony and medical proof, showed that Father knowingly exposed T.J. to abuse and neglect that was likely to cause serious bodily injury or death, in accordance with the definition of severe abuse contained in Tennessee Code Annotated § 37-1-102(b)(23). There was evidence that Father was abusing drugs and was "out of it" at a time when he was responsible for the care of this medically fragile child. The proof further showed that Father contributed to causing T.J. to be without medication that was prescribed to control his seizures, ultimately resulting in his hospitalization for increased seizure activity. As Dr. Palmer pointed out, going without this medication put T.J. at risk of serious bodily injury or death. The testimony established that Father regularly smoked in the presence of T.J. and his oxygen tanks. Dr. Palmer opined that this environment put the child at risk for serious bodily injury or death, either due to his serious respiratory distress or the potential for fire or explosion. Finally, there was evidence that Father had been co-sleeping with T.J., which Dr. Palmer stated also placed the child at great risk of serious bodily injury or death due to his fragile state and Father's drug abuse issues.

Father contends that he cannot be found to have committed severe child abuse for several reasons, including: (1) he did not test positive for benzodiazepines and thus could not have ingested[2] T.J.'s Klonopin; (2) he was unaware that co-sleeping with T.J. put the child at risk; and (3) no one actually witnessed Father smoking around T.J. We disagree. First, Father was the person who took responsibility for "spilling" T.J.'s Klonopin prescription, which occurrence he admitted to several witnesses. Father did not attempt to refill the prescription. Instead, he allegedly administered a reduced form of an adult dose to T.J.

The fact that Father did not have Klonopin in his system on June 8, 2011, is insignificant, as it was shown that Klonopin could not be detected after three days. What is compelling is that Father shared responsibility for making sure that T.J. had the appropriate dose of his prescribed medication in his system to control his seizures. Father failed in this parental responsibility. It is irrelevant whether Father ingested the Klonopin himself, it was used by someone else, or a spill occurred. Of importance is that T.J. needed Klonopin but did not have it available due to Father's conduct. Dr. Palmer testified that the lack of this medication was extremely dangerous to T.J. and carried the risk of serious bodily injury or death.

---

[2] Ms. Fox testified, however, that when she interviewed the parents a few days after the removal, she asked them why they tested positive for THC, and Father stated, "If you're around it, you're going to do it." Ms. Fox explained that when she asked Mother about the positive result for benzodiazepines, Father replied, "If someone gives them to you, you're going to take them."

Father admits co-sleeping with T.J. but argues that he did not know the inherent risks of such circumstance. This argument is likewise without merit. Dr. Palmer testified as to the danger of overlying a child during co-sleeping and further testified that this risk was well known. This danger clearly would be compounded by a parent who was under the influence and a child who was both immobile and non-communicative. Dr. Palmer opined that co-sleeping with T.J. could also result in serious bodily injury or death.

Finally, Father asserts there was no proof he actually smoked around T.J. or his oxygen tanks. Two witnesses who lived in the home, however, testified that Father did just that. Charles A. expressly stated that both parents knew they were not supposed to smoke inside the home but did so anyway. Taylor likewise reported to the forensic interviewer that her parents smoked inside the home. Numerous witnesses confirmed that the home had a strong odor of smoke inside and that there were lighters in the family's bedrooms and ashtrays overflowing with cigarette butts. The photographic evidence corroborated this testimony. Notably, Father failed to protect the child from smoke inhalation, knowing such to be dangerous for him. Father also had knowledge that there was a risk of explosion from smoking around the oxygen tanks.

The evidence does not preponderate against the trial court's determination by clear and convincing evidence that Father committed severe child abuse. The trial court did not err in terminating Father's parental rights based upon this ground.

<h2 align="center">V. Best Interest of Children</h2>

Father contends that the trial court did not make sufficient findings regarding the best interest analysis. He specifically argues that the trial court simply concluded that termination was in the Children's best interest based on its finding that severe child abuse had occurred. We disagree.

When a parent has been found to be unfit by establishment of a ground for termination, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005). Tennessee Code Annotated § 36-1-113 (Supp. 2012) provides that the trial court must find that termination is in the child's best interest and must also enter an order in which it makes specific findings of fact and conclusions of law. The statutory requirement to prepare written findings of fact and conclusions of law applies with equal force to both the grounds for termination and the best interest analysis. *See In re G.N.S.*, W2006-01437-COA-R3-PT, 2006 WL 3626322 at *7 (Tenn. Ct. App. Dec. 13, 2006).

The trial court's final order expressly states, in pertinent part:

In this case, the Court finds that there is clear and convincing evidence that termination of [Mother] and [Father]'s parental rights is in the best interest of the children in that testimony shows that the parents have not addressed their substance abuse in any meaningful way; that the parents have not improved their home or personal condition so as to make it safe for the children to return to their custody; the children are closely bonded to their foster parents; that the children are well adjusted in the foster homes and in their schools; and that the children's behaviors have improved since placement in the foster parent homes.

Tennessee Code Annotated § 36-1-113(i) (Supp. 2012) provides a list of factors the trial court is to consider when determining if termination is in the child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *In re Audrey S.*, 182 S.W.3d at 878. Further, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

In this case, the trial court appropriately made findings regarding the statutory factors, as quoted above. Upon our review of the record, we conclude that the evidence preponderates in favor of the trial court's factual findings.

Father presents a long history of drug problems, this being the third time he has lost custody of the Children. Most recently, Father claimed to be attending a methadone clinic in Georgia to treat his drug addiction but never provided any documentation to prove this claim. DCS was unable to verify this assertion. Father did not provide any evidence to show that he has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the Children's best interest to be in his custody. After years of drug addiction and purportedly receiving treatment for same, a lasting adjustment does not reasonably appear possible. The DCS worker assigned to Father testified regarding several significant matters, including that: (1) he did not stay in contact, (2) he never attended his scheduled parenting classes, (3) he had not submitted to a hair follicle drug screen, and (4) his contact information was unknown at the time of trial. As the trial court determined, Father failed to make the Children a priority and was seemingly unwilling to work with DCS to regain custody.

Father had only visited with T.J. once since June 8, 2011, but had visited the other Children on twelve out of fifteen possible visits. The caseworker testified that Father was

normally late for the visits, on one occasion by over an hour. Father had not contacted DCS about the older Children and had not contacted T.J.'s foster mother during the entire custody period to inquire about T.J. Father failed to attend T.J.'s medical appointments or surgery the child underwent in August 2011. Taylor was the only child to testify, stating that she did not wish to return to her parents' care and custody. There was no proof of a meaningful relationship between Father and the Children.

The evidence further supports the finding that a change of caretakers would have detrimental effect on all the Children. Fortunately, T.J. was showing improvement in his foster placement. He was clearly loved by his foster family, who wished to adopt him. The foster mother testified that T.J. was loving, "precious," and "the light of [her] home." She noted that T.J. had shown cognitive improvement and had even begun to smile since being with her. All of T.J.'s needs were being met, and his respiratory problems had lessened such that he was no longer required to be on oxygen. The other Children were performing well in school. They appeared to be thriving and happy in the foster placement. Taylor testified that she wished to remain with her foster family and be adopted.

This Court has found that Father was guilty of severe child abuse. At the time of trial, Father maintained no home. There was no showing that he could adequately provide for the Children. Father also did not establish that he had addressed his substance abuse issues such that he could appropriately care for the Children in a safe and stable manner. No evidence was presented of Father's mental or emotional status or payment of child support.

From our examination of the record before us, we determine that there is clear and convincing evidence that termination of the Father's parental rights was in the Children's best interest.

## VI. Conclusion

The judgment of the trial court terminating the parental rights of Father is affirmed. Costs on appeal are taxed to appellant, Bernard H. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE