IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 2, 2024

## IN RE S.C. ET AL.

**Appeal from the Circuit Court for Tipton County**
**No. 7919      A. Blake Neill, Judge**

_____

### No. W2022-01709-COA-R3-JV
_____

Mother appeals the trial court's finding that her children were dependent and neglected. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and JEFFREY USMAN, JJ., joined.

Jeremy T. Armstrong, Dyersburg, Tennessee, for the appellant, E.C.

Jonathan Skrmetti, Attorney General and Reporter; Amber L. Baker, Senior Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

## OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

On August 12, 2019, Petitioner/Appellee the Tennessee Department of Children's Services ("DCS") filed a petition to declare the two children[1] of Respondent/Appellant E.C. ("Mother") and Respondent K.H.C. ("Father") dependent and neglected.[2] Therein, DCS alleged, inter alia, that Mother was suffering from paranoid schizophrenia, which caused her to be committed to Crestwyn Behavioral Health ("Crestwyn"). Specifically, the

_____

[1] At the time of the petition, the parties' son ("Son") was ten years old, while the parties' daughter ("Daughter") was six.

[2] In cases involving dependency and neglect, it is the policy of this Court to redact the parties' and children's names to protect their identities.

petition alleged that Mother was suffering from delusions that Father, her ex-husband, was stalking her, trying to poison her with arsenic, and had given her and the children "parasites." DCS noted that family friends Michael E. and Virginia E. ("Foster Mother," and together with Michael E., "Foster Family") had agreed to take custody of the children when Mother was hospitalized. As such, DCS asked that an emergency protective custody order be entered placing the children in the care and custody of Foster Family or DCS and that the children be declared dependent and neglected.

A protective custody order placing the children with Foster Family, or in the alternative, DCS, was entered the same day. Mother and Father were thereafter appointed counsel, and a guardian ad litem ("GAL") and court appointed special advocate were appointed for the children.

On August 28, 2019, the Tipton County Juvenile Court ("the juvenile court") entered an order following a preliminary hearing. After hearing the proof, the juvenile court ruled that the children would remain in Foster Family's custody, that Father would have supervised visitation, and that Mother would have no contact with the children.

On September 4, 2019, the parties entered into an agreed order providing for Mother and the children to participate in complete psychological assessments and for the participants to follow all recommendations. On October 22, 2019, DCS filed a motion to suspend Father's visitation with the children, citing the fact that both children stated during their psychological assessments that they did not wish to visit Father due to past abuse. As such, the recommendations of the assessments were to suspend visitation. On November 6, 2019, the juvenile court suspended Father's visitation pending further orders of the court. In December 2019, Mother's appointed counsel was permitted to withdraw, as Mother had retained private counsel.

On December 4, 2019, Mother's psychological evaluation with licensed psychological examiner Will Beyer was filed with the juvenile court. The adjudicatory hearing was held on January 22, 2020. On the same day, the juvenile court entered an order stating that the parties stipulated that the children were dependent and neglected. Custody remained with Foster Family and no visitation with the parents was permitted until the children's counsel recommended visitation. Mother was also ordered to comply with all recommendations from her psychological evaluation, including obtaining "psychiatrist assistance . . . to address paranoid and bizarre thinking patterns." Mother was specifically directed to seek assistance from a licensed psychiatrist.

On May 7, 2020, the juvenile court entered an order directing the children's counselor to contact Mother's counselor in order to determine whether visitation could be permitted. Father was also recommended to obtain a mental health assessment.

On November 17, 2020, Mother filed a pro se petition for, inter alia, the return of

- 2 -

the children, the children's counselor to be removed as a decision-maker with regard to visitation, the reassessment of the children by a mental health care provider of Mother's choosing, and the payment by DCS of the therapy costs for Mother and the children to ameliorate parental alienation, as well as other damages. In support, Mother filed twenty-six exhibits. On the same day, the juvenile court entered an order allowing Mother's retained counsel to withdraw and giving Mother time to find new counsel. On December 16, 2020, the juvenile court appointed new counsel for Mother.

There was a lull in the matter for several months. Eventually, on July 28, 2021, Mother filed another pro se pleading seeking the return of the children. The dispositional hearing occurred on July 29, 2021, after which time the juvenile court judge took the matter under advisement and issued an oral ruling on September 22, 2021.

A detailed dispositional hearing order was entered on November 22, 2021. Therein, the juvenile court found that Mother had not complied with the recommendations set forth in the adjudicatory hearing order, in that Mother had not participated in psychiatric treatment for her mental health. The juvenile court further noted that Mother submitted a forensic mental health evaluation completed by Bradley W. Freeman, M.D., on October 30, 2020; although Mother intended the report to counter the previous assessment, the juvenile court found that "Dr. Freeman's assessment was consistent with the prior assessment by [Mr.] Byer" and that Mother continued to suffer from delusional, persecutory type disorder. The juvenile court judge further found that Mother's testimony at the dispositional hearing was delusional and that Mother refused to acknowledge her delusions. Further, the juvenile court found that Mother's behavior has caused psychological harm and psychological abuse to the children.

After considering all of the proof, the juvenile court ruled that the children were dependent and neglected and would remain in the custody of Foster Family. The restriction on Mother's visitation was kept in place. Again, the juvenile court directed Mother to seek assistance from a licensed psychiatrist and noted that Mother's ability to have contact with the children "rests solely on her seeking treatment." Mother thereafter filed a timely notice of appeal to the Tipton County Circuit Court ("the trial court").

Mother was appointed new counsel in the trial court. The parties engaged in various disputes in the trial court over access to records, visitation, and other matters. During the pendency of the trial court proceedings, Son began a residential treatment program at Lakeside Behavioral Health System ("Lakeside") due to self-harming behaviors. Son was discharged in April 2022, but Lakeside recommended that he not be placed with other children or in a public-school setting. So Son was placed in DCS custody. By June 2022, Son was admitted to Oak Plains Academy.

Eventually, the de novo trial on the dependency and neglect petition was heard on September 27 and November 1, 2022. In order to protect the privacy of the children at

issue, we recount the proof only as necessary to resolve the issues raised in this appeal.

The proof showed that Mother and Father were divorced in 2016 based in large part on a disclosure by Son of alleged sexual abuse by Father when Son was four years old. Although an investigation was commenced and no child protective services agency or court ever substantiated the allegation, Father's visitation with the children was supervised pursuant to the divorce decree.

Years following the divorce, Mother came to believe that Father was having her followed, hacking her phone to delete photographs, and infiltrating her home to leave innocuous items such as hairbrushes lying about. Mother also came to believe that Father was attempting to kill her when she awoke one morning with an unknown white powder all over her person and she became very sick the next day.

In June 2019, during a supervised visit with Father at the Memphis Zoo, Mother came to believe that Father had contaminated her and the children's drinks with "parasites." Mother would then claim that the family was infested with parasites, which she treated by rubbing olive oil on their skin, eating diatomaceous earth,[3] and shaving Son's head.[4] Although Mother sought medical treatment, no doctor ever confirmed the presence of parasites.

On August 9, 2019, Mother left her home to stay in a hotel with the children in order to avoid tracking by Father. The next morning, Mother believed that someone was watching her at Father's behest; Mother approached the individual's car with her hand inside her purse on her firearm. The police were called and directed Mother to report to the hospital for psychiatric evaluation. At the hospital, Mother told a DCS investigator that Father was trying to poison Mother and the children with arsenic. Son confirmed to the investigator that Father was tracking Mother and the children based on what Mother had told the children. Foster Family, who Mother knew through church and a homeschooling initiative, came to the hospital to collect the children while Mother was being treated. The hospital diagnosed Mother with paranoia and Mother was involuntarily committed to Crestwyn, where she stayed ten days before being voluntarily discharged. Although Mother was prescribed medication upon her release, she took herself off the medication without a doctor's approval due to the side effects. Mother was not taking any psychiatric medication at the time of trial and was not under the care of a licensed psychiatrist. Instead, the proof showed that Mother had seen a string of mental health counselors,[5] only one of whom was

---

[3] Diatomaceous earth is "[a] light-colored porous rock composed of the shells of diatoms." *The American Heritage College Dictionary* (4th ed. 2002); *see also Diatom*, *The American Heritage College Dictionary* ("Any of the various microscopic one-celled or colonial age algae of the class Bacillariophyceae, having cell walls of silica consisting of two interlocking symmetrical valves.").

[4] Mother almost shaved Daughter's head, but instead only cut it in an uneven manner.

[5] Mother saw a total of seven counselors, including one unlicensed family friend who Mother testified "counseled" her and was a "great help." This was the person who recommended diatomaceous

a licensed psychiatrist,[6] during the custodial period.

As previously discussed, Mother participated in two psychological evaluations during the pendency of this case. Both evaluations were entered as exhibits at trial without objection.

The first consisted of a psychological evaluation with parenting assessment component performed by Mr. Beyer on October 16, 2019. Therein, Mr. Beyer opined that Mother suffered from Delusional Disorder of the persecutory and somatic types.[7] Thus, Mr. Beyer found that Mother suffered from delusions wherein she believes "she is being conspired against, followed, poisoned or drugged, maliciously maligned, harassed or obstructed in the pursuit of long-term goals." Mother's delusions were also "somatic" in that they involved bodily functions. Mr. Beyer characterized Mother's delusions as bizarre, or clearly implausible. According to Mr. Beyer, Mother's delusional beliefs were "still readily apparent" and had "the potential to result in further interventions that have at least some capacity for emotional, psychological or physical harm to the children."

Still, Mr. Beyer characterized the risk as minimal, but recommended only supervised visitation and that Mother obtain psychiatric assistance and counseling. In particular, he noted that a psychiatrist would be better positioned to determine Mother's ability to resume parenting. The report cautioned, however, that there may be challenges in that regard as Mother's "paranoia may be re-directed towards those seeking to help her." Mr. Beyer further opined that in order for Mother to safely parent, "[t]here should be no evidence of delusional beliefs or intentionality to 'treat' the children for any illness that have not been conclusively diagnosed by a licensed medical practitioner."

Mr. Beyer's evaluation report further contained a guide to future treatment of Mother, including the warning that "[t]his woman may use her considerable appeal and charisma to effectively smooth over even the most direct accusations of problem creation. This is a well-oiled defense that catches even experienced therapists off guard[.]" The report further stated that Mother "may be convinced that if she were just left alone, she could work matters out on her own. However, this conviction can often lead to backsliding and reoccurrences of her less than socially-acceptable behavior."

The second evaluation, a forensic mental health evaluation by Dr. Freeman, took place on October 30, 2020. This evaluation consisted of interviews with not only Mother, but also her father and friends. Following his investigation, Dr. Freeman concluded that

---

earth to Mother to combat her health issues and the parasites.

[6] The license of this psychiatrist was eventually suspended. Mother testified that she wanted to leave the psychiatrist's care even before the suspension, due to the psychiatrist's recommendation that Mother take medication. According to Mother, the medication recommendation really resulted from the GAL's insistence, but Mother did not need the medication.

[7] Mr. Beyer did not diagnose Mother with schizophrenia.

Mother meets the criteria for delusional disorder, persecutory and somatic types. Dr. Freeman also noted that Mother meets the criteria for an adjustment disorder with anxious features, but not schizophrenia. According to Dr. Freeman, Mother maintained that she had been infested with parasites and her friends also supported that claim. Dr. Freeman noted that Mother produced no photographs or other documentation to support a parasitic infection. Mother also claimed that her "odd behavior and paranoia," leading to her hospitalization, stemmed from "the initial transitory period" of a rigid diet causing her blood sugar to drop. Dr. Freeman noted that Mother's medical records did not support that claim.

Dr. Freeman nevertheless concluded that Mother could be a safe and effective parent, but that if she "were to have an exacerbation of delusional thoughts, this could place the children at increased risk of harm in the future." Dr. Freeman recommended that Mother continue to work with a therapist and "be monitored by a medication provider."

The children's counselor, Mary Hamm, a licensed clinical social worker, testified to her interactions with both children following the removal, beginning around January 2020. Ms. Hamm treated Son until he was placed in Lakeside. During the two years of his treatment with Ms. Hamm, Son continued to see parasites that no one else could see,[8] laugh and talk to himself, struggle with aggression, pick at his skin until it bled, and eventually hit his head against the wall. These last two behaviors caused Foster Family to take him immediately to Lakeside.[9]

While Daughter confirmed that Mother informed her of the alleged abuse of Son by Father,[10] Father's alleged stalking, and the alleged parasitic infection, Daughter fortunately never shared in Mother's delusions as Son did. Ms. Hamm was still treating Daughter at the time of trial. Ms. Hamm testified that she reached out to the counselors of both Mother and Father to determine if visitation could be facilitated with Daughter. After speaking with Father's therapist, she allowed Father to have supervised visitation with Daughter; the visitation was going well.

In contrast, Ms. Hamm testified, over objection, that she had not permitted Mother to participate in the therapy because of Mother's refusal to accept any responsibility for any of the trauma that the children suffered. Specifically, Ms. Hamm testified that she contacted more than one of Mother's therapists, who informed her that Mother does not believe that any of the issues were her fault and that she is "fine." According to Ms. Hamm,

---

[8] Ms. Hamm testified that Son shared Mother's delusions and that it was caused by Mother. She admitted, however, that she could not rule out that Mother and Son both suffered from some genetic disorder that caused psychosis or delusions.

[9] In some of 2021, Son was attending an outpatient-type treatment program Monday through Friday from 6:00 am to 6:00 pm.

[10] In particular, Foster Mother testified that Daughter knew the details of the alleged sexual abuse and believed that Father was trying to kill her and Mother in order to rape Son.

it would not be clinically appropriate to allow Mother contact with the children until she takes responsibility for the "unstableness" in her children's lives.

Son testified as well. At the time of trial, he was still residing at Oak Plains Academy. When he began there, records indicated that he was experiencing thoughts of self-harm and was diagnosed as suffering from post-traumatic stress disorder; the records also indicated that he had improved during his treatment. In his testimony, Son explained that Mother claimed that the parasites had infested their bodies and their home. So Mother would not allow the children to consume foods and drinks that fed the parasites, such as pork. Mother also informed Son that Father was trying to poison him and the family. Son testified that he now recognized that Mother's concerns about Father's stalking and the parasites were not true and the result of Mother's hallucinations. Son also testified that Mother told him "a whole lot" about Father's sexual abuse of him; Son testified that he had no independent memory of the alleged abuse, but only knew what Mother told him. Son testified that he is not sure that the abuse occurred as "[t]here's no evidence of that being true." Son testified that if and when he is released from Oak Plains, he currently hopes to return to Foster Family.

Mother denied that she had ever suffered from delusions. Instead, she maintained that the alleged hacking of her phone,[11] the items found in the home that did not belong to the family, the existence of the white powder,[12] and the parasitic infection[13] were all real and not delusions. Indeed, Mother testified that she could not have any mental health issues and did not need mental health treatment because she was living a normal life.[14]

Mother further explained that she chose to treat her physical health issues with diatomaceous earth even before the issue with the parasites arose, after learning about it from a friend who survived cancer. With regard to the parasites, Mother claimed that they were both big and small, and came out of her skin, nose, and mouth. Mother further claimed that she had taken pictures of the parasites but they were deleted from her phone without her permission, leading her to believe that her phone was hacked. Mother also testified that she went to her primary care provider, who could not find any evidence of parasites, as well as an infectious disease doctor with a jar of the parasites. The infectious disease doctor performed no physical exam and merely told Mother that the sample did not contain hook worms; according to Mother, that doctor was known for not listening to patients. Mother testified that she sought out another doctor in the same practice, but he would not see her

---

[11] Mother testified that she does not believe that Father is currently stalking her.

[12] Mother testified that her statement to a DCS investigator that the white powder was arsenic placed on her by Father to poison her was taken out of context and she only stated that "[m]aybe it could have been" arsenic.

[13] Mother testified that she no longer had issues with parasites as far as she knew.

[14] Specifically, when asked about whether she sought mental health treatment following her discharge from Crestwyn, Mother explained that she "was not having any [mental issues] at the time. . . . I mean I don't know what mental health issues I would need help with that were ongoing at that time."

as per an internal policy.

Mother also admitted that she told Son about the alleged sexual abuse by Father, but only minimally in order to keep him safe. Mother denied telling Daughter about the alleged abuse, but admitted that she might have overheard Mother talking about it.

Paul Barkley, a licensed professional counselor with a doctorate in education, also testified. Dr. Barkley had been treating Mother since October 2021. Dr. Barkley acknowledged that he was the last in a string of mental health professionals seen by Mother. But Dr. Barkley did not believe that Mother's inability to get consistent psychiatric treatment was "doctor shopping" because Mother simply could not find anyone to treat her.

Dr. Barkley testified that after treating Mother and hearing the testimony at trial, he did not believe that Mother currently suffers from delusions, but only an adjustment disorder that does not affect her ability to parent her children. Instead, Dr. Barkley viewed Mother and her children as victims "of the system."

With regard to the parasites, Dr. Barkley explained that he came to his conclusion because "he can't dispute the reality" that Mother saw parasites, her beliefs "are within the bounds of reality[,]" and Mother "has not lost touch with realities[.]" Dr. Barkley testified that his belief was that Mother was "making decisions about what she believes are the parasites . . . [a]nd I think she gets to make that decision as long as it doesn't get in the way of harming herself or her children[.]" When asked about Son's actions in scratching himself until he bled due to perceived parasites, Dr. Barkley minimized the issue by noting that he had scratched himself that day. Dr. Barkley also seemed to agree that shaving Son's head was a step too far: "I am not agreeing to shaving. Cutting his hair was a rational way of dealing with parasites." But Dr. Barkley admitted that if he received medical confirmation that there were no parasites, then Mother had indeed been suffering from a delusion.

Dr. Barkley further testified that Mother's beliefs as to Father's stalking were not delusions because Mother believed those things and did not "make irrational choices" in moving out of her home to a hotel. But again, if those beliefs were not true, then Dr. Barkley confirmed that Mother would have been suffering from a delusion.

Dr. Barkley did concede that Mother's belief as to the white powder and some of the other incidents involving Father leaving items in her home could have been delusions. And he admitted that the proper treatment for such a delusion would be to recognize that "really wasn't what [it was] perceived to be" and that it was instead a delusion. Dr. Barkley further agreed that when a patient refused to acknowledge delusions, the delusions run the risk of being exacerbated.

Dr. Barkley further admitted that it was harmful for Mother to tell the children that Father was trying to kill them and that "should not have happened." Dr. Barkley also

admitted that it was an issue for Mother to remind Son of the alleged abuse and "[t]hat should not happen."

On November 14, 2022, the trial court entered a detailed order ruling that the children remained dependent and neglected at the time of the de novo hearing. After recounting the proof presented, the trial court found that Mother suffers from delusional disorder and she has not sought proper treatment for her mental health issues. Moreover, the trial court found that while Mother's "delusional beliefs are waning under Dr. Barkley's continued therapy, . . . there remains evidence of delusional beliefs and . . . [Mother] continues to deny that she suffered any delusions." The trial court further found that while Dr. Barkley was credible in many instances, it would not accept his opinion wholesale, as the proof showed that

> (1) [Mother] suffers from delusions and paranoia; (2) these delusions and paranoia caused mental harm to her children; (3) [Mother] is receiving mental health treatment but continues to struggle with delusions and needs help keeping her thoughts within rational bounds; and (4) [Mother] refuses to acknowledge these delusions and the harm they caused her children and continues to believe that she is the victim of a vast conspiracy. These facts demonstrate that [Mother] continues to suffer from a mental incapacity that makes her unfit to properly care for her children. Her delusions have already caused [Daughter] and [Son] mental harm. And her unwillingness to even admit that it is possible she suffers from delusions or that these delusions caused her action and harmed her children demonstrates that she is not fit to properly care for her children.

As a result, the trial court ruled that custody of Daughter would remain with Foster Family, while custody of Son would remain with DCS. Both Mother and Father were permitted supervised visitation with the children. Mother was required, however, to meet some counseling requirements prior to the visitation. Mother was forbidden from disparaging Father in the children's presence, including referencing any alleged past abuse, stalking, or parasites. Mother was also once again ordered to meet with a psychiatrist and to follow all recommendations. Mother thereafter filed a timely notice of appeal to this Court.

## II. ISSUES PRESENTED

Mother raises the following issue for our review: "Whether the trial court improperly concluded that the minor children were dependent and neglected children under the law at the time of the adjudicatory hearing due to the mental incapacity of [Mother]."[15]

---

[15] Although Father participated in the trial court proceedings, he has not challenged the dependency and neglect finding, the placement of the children, or the visitation order on appeal.

### III. ANALYSIS

In this appeal, Mother challenges the trial court's finding that the children were dependent and neglected. "A parent's right to the care and custody of his or her child is among the oldest of the liberty interests protected by the due process clauses of the federal and state constitutions." *In re H.L.F.*, 297 S.W.3d 223, 232 (Tenn. Ct. App. 2009) (citations omitted). "Although this right is fundamental, . . . it is not absolute. The right continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination, such as when the child is found to be dependent and neglected[.]" *Id.* at 232–33 (citations omitted).

Tennessee law defines a dependent and neglected child as, inter alia, a child "[w]hose parent, guardian or person with whom the child lives, by reason of . . . mental incapacity . . . is unfit to properly care for such child[.]" Tenn. Code Ann. § 37-1-102(b)(13)(B). Pursuant to Tennessee Code Annotated section 37-1-159, a party is permitted to appeal a juvenile court's finding of dependency and neglect to the circuit court, which shall try the matter de novo. Tenn. Code Ann. § 37-1-159(a). "The de novo hearing requirement directs the circuit court to determine whether the child is dependent and neglected as of the time of the new hearing." *In re Lukis B.*, No. M2016-00357-COA-R3-JV, 2017 WL 1103043, at *2 (Tenn. Ct. App. Mar. 24, 2017) (citing *In re Caleb L.C.*, 362 S.W.3d 581, 599 (Tenn. Ct. App. 2011)). In the trial court, DCS was therefore required to prove, by clear and convincing evidence, that Mother was unfit to care for her children due to a mental incapacity at the time of the de novo hearing. *See* Tenn. Juv. R. Prac. & Proc. 307(e)(1); *In re Isaiah W.*, No. E2022-00575-COA-R3-JV, 2023 WL 3222700, at *5 (Tenn. Ct. App. May 3, 2023), *perm. app. denied* (Tenn. Sept. 11, 2023). Under this standard, the evidence "must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence." *In re Lukis B.*, 2017 WL 1103043, at *1 (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)).

Whether the petitioner has proven by clear and convincing evidence that a child is dependent and neglected is an issue of law that we review de novo with no presumption of correctness. *In re H.L.F.*, 297 S.W.3d at 233. "To the extent the trial court made findings of fact in support of the ultimate issues, we review the factual findings . . . *de novo* with a presumption of correctness unless the evidence preponderates otherwise." *Id.* (citing Tenn. R. App. P. 13(d)). When a trial court's determinations rest on its assessment of the credibility of the witnesses before it, those "determinations will not be overturned absent clear and convincing evidence to the contrary." *In re Lukis B.*, 2017 WL 1103043, at 2 (citing *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999)).

Here, the trial court found that Mother was suffering from a mental incapacity that made her unfit, at the time of the de novo hearing, to properly care for her children. Specifically, the trial court relied on Mother's consistent diagnoses of delusional disorder and her refusal to admit to having suffered any delusions in the past. The trial court noted

that although Mother's current therapist did not believe that Mother suffered from delusions, he admitted that Mother's beliefs, without support, would constitute delusions. The trial court further noted that notwithstanding multiple orders to do so, Mother had never consistently sought the care of a licensed psychiatrist, despite the fact that an exacerbation of her delusions could place the children at risk of harm.

On appeal, Mother's argument is threefold. First, she asserts that the trial court erred in allowing Ms. Hamm to testify as to certain matters and in relying on that testimony. Second, she asserts that the trial court should not have discounted the testimony of Dr. Barkley. Finally, she asserts that the trial court erred in determining that the children remained dependent and neglected at the time of the de novo hearing. We will consider each argument in turn.

As an initial matter, Mother asserts that the trial court "improperly credited the testimony of [Ms.] Hamm while allowing her to give expert testimony." In particular, Mother takes issue with the fact that Ms. Hamm was allowed to testify that Mother had not "expressed her acceptance of her role in the children's problems or of her own issues" because Ms. Hamm had not examined Mother. Thus, Mother argues that the trial court allowed Ms. Hamm to testify beyond the scope of a treating provider and more in line with an expert witness. Mother argues that this testimony was objected to on the basis that Ms. Hamm was not disclosed as an expert at trial.

In our view, this issue goes to the trial court's evidentiary ruling as to the scope of Ms. Hamm's testimony. As Mother correctly notes in her brief, "questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court." *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263 (Tenn. 1997). But Mother did not designate any evidentiary question as an issue on appeal. So any question as to the admissibility of this evidence is waived. *See Childress v. Union Realty Co.*, 97 S.W.3d 573, 578 (Tenn. Ct. App. 2002) ("We consider an issue waived where it is argued in the brief but not designated as an issue.").

To the extent that Mother is arguing that the trial court erred in relying on Ms. Hamm's testimony that Mother refused to acknowledge her mental health issues or her role in the children's trauma, we also disagree. As an initial matter, we note that Ms. Hamm's testimony concerning Mother's refusal to acknowledge her own issues and the effect on her children related to the question of why Ms. Hamm, as Daughter's treating counselor, did not allow Mother to participate in Daughter's therapy. Thus, Ms. Hamm was not presenting evidence of Mother's condition for purposes of diagnosing her, but only for purposes of explaining her treatment of Daughter.[16]

---

[16] In her brief, Mother makes a passing mention that Ms. Hamm's testimony relied on "unreliable hearsay[.]" She does not provide more than a skeletal argument that this testimony should have been excluded on this basis. As such we will not address it. *See Sneed v. Bd. of Pro. Resp. of Sup. Ct.*, 301

Moreover, the record on appeal is replete with evidence that Mother continues to deny that she suffered from any delusions or that her delusions harmed her children. This evidence includes the DCS-acquired psychiatric evaluation, the evaluation that Mother obtained, and Mother's own testimony. So then, the evidence on appeal, even apart from Ms. Hamm's testimony, supports a finding that Mother continues to deny her mental health issues and the impact those issues have on the children.[17]

Mother next argues that the trial court improperly discredited the testimony of Dr. Barkley, who was the only mental health professional still seeing Mother at the time of the de novo hearing. Respectfully, Mother's argument on this issue is somewhat difficult to understand. After citing law surrounding the gatekeeping function of the trial court relative to expert testimony, Mother simply recites Dr. Barkley's qualifications and testimony, as well as the trial court's findings as to that testimony. As such, it is difficult to discern what error Mother contends the trial court committed with respect to Dr. Barkley's testimony beyond the conclusory statement that it was improper for the trial court to discredit Dr. Barkley. *See* Tenn. R. Ct. App. 6(a) (requiring the appellant's brief to include a statement of the alleged erroneous action by the trial court and a statement of how the appellant was prejudiced by the error).

In general, the fact-finder is free to accept the opinion of one expert over another, ***Hinson v. Wal-Mart Stores, Inc.***, 654 S.W.2d 675, 677 (Tenn. 1983), or even to reject expert proof "even if it is not contradicted." ***O'Brien v. Rheem Mfg. Co.***, No. M2003-00530-COA-R3-CV, 2004 WL 1196115, at *2 (Tenn. Ct. App. May 27, 2004). Here, the trial court had before it two mental health evaluations that stated that Mother suffered from delusions. Although these evaluations were completed, at the latest, a year prior to trial, Mother's testimony at trial indicated that she still believed that Father had been stalking and trying to poison her and that she was infected with parasites by him. After considering the complete lack of proof to support those beliefs, the trial court found that Mother's paranoia and delusions were not fully remedied such that the risk of harm to the children was not eliminated. And indeed, Dr. Barkley himself admitted that a person who believed what Mother believed without proof was suffering from delusions and that exacerbated delusional thoughts could harm the children; he further admitted that a refusal to acknowledge the delusions makes it more likely that they will recur. Moreover, Mother's testimony confirmed that she had never truly examined these issues in any of her mental

S.W.3d 603, 615 (Tenn. 2010) ("It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived."). And, as discussed, infra, the information that Ms. Hamm obtained was not unreliable, as it accurately reflected Mother's continued view that she had no role in the harm that her children suffered.

[17] Mother also appears to challenge the fact that Ms. Hamm was allowed to dictate whether Mother could visit with the children. As previously discussed, the trial court permitted supervised visitation with the children going forward subject to some conditions. Mother has not designated that ruling as an issue on appeal, so we do not address it.

health treatment to date—according to Mother, there was nothing to treat and she was simply complying with the juvenile court's orders in order to regain custody of her children. The report from the first psychological evaluation warned that Mother's charisma and personality could cause even well-trained mental health professionals to deny her mental health issues. The trial court's finding that Dr. Barkley was acting as an advocate for Mother suggests that he indeed may have fallen into this trap, despite the ample evidence that Mother's delusions had not been remedied. As such, we cannot conclude that the trial court erred in refusing to credit Dr. Barkley's testimony that Mother did not suffer from a disorder that caused delusions.

Finally, Mother argues that the trial court erred in concluding that the children were dependent and neglected at the time of the de novo hearing. In support of this argument, Mother argues that the previous mental evaluations of Mother were of "limited relevance" due to their timing, that her current therapist opined that she was not a risk to the children, that Ms. Hamm's testimony could not be relied upon, as discussed above, that the proof shows that Daughter is doing well, and that Son's issues "could be genetic or organic in nature" and have improved since the removal.

After reviewing the proof, however, we conclude that the evidence presented leaves no serious or substantial doubt that, at the time of the de novo hearing, Mother was unfit to care for her children due to mental incapacity. Here, the evidence shows that the children were removed when Mother was involuntarily committed to a mental health facility due to paranoia concerning Father. At the time, Mother told a DCS investigator that Father was sending people to spy on her, had come into her home to leave innocuous items, and had tried to poison her with arsenic. Even Mother's current counselor, who Mother asserts should have been relied upon more heavily by the trial court, admits that Mother's beliefs as to the latter two issues were possibly delusional. Mother also believed that she and the children had been infected with parasites by Father, but no medical professional ever diagnosed Mother or the children with a parasitic infection. Two mental health evaluations have concluded that Mother suffered from delusions and paranoia that she was being victimized, and should be seeking psychiatric support.

Although Mother is no longer hospitalized and is seeing a therapist, the evidence is clear that she does not believe that her behavior at the time of removal was caused by delusional thinking or that her behavior has caused her children any harm. This despite the testimony that, among other things, Son was picking at his skin to remove non-existent parasites such that Foster Family took Son immediately to Lakeside due to the amount of bleeding he caused to himself.[18] Mother's belief that Father was out to get her also caused Mother to inform Son and Daughter of the alleged sexual abuse of Son and to cause Son and Daughter to fear that Father would return to kill Mother and Daughter in order to assault Son. Even Mother's proffered expert agreed that this behavior was harmful to the

---

[18] Dr. Barkley's minimization of this effect on Son is particularly troubling.

children.

And the evidence shows that despite a history of delusional thinking, Mother has avoided real treatment as to this issue. Instead, Mother's mental evaluations, as well as her own testimony, indicate that her efforts in this case stem not from a desire to treat her issues, but simply to have her children returned to her. Indeed, she sometimes told the evaluators to write down what she believed they wanted to hear.[19] Despite knowing that the juvenile court wanted Mother to seek psychiatric treatment for her issues, Mother denied that she had them and then saw a string of mental health professionals, only one of which was a psychiatrist, until she found one that would testify in her favor in court.[20] Thus, it appears that Mother has suffered from delusions, continues to believe those delusions, and has done nothing to treat the underlying mental health issues that caused the delusions. And the general consensus among the medical professionals who provided opinions in this case was that (1) refusing to admit to delusions could make them more likely to recur and exacerbate; and (2) an exacerbation of the delusions could harm the children. Under these circumstances, we conclude that the trial court did not err in finding clear and convincing evidence that the children were dependent and neglected at the time of the de novo hearing.

## IV. CONCLUSION

The judgment of the Tipton County Circuit Court is affirmed, and this cause is remanded to the trial court for all further proceedings as are necessary and consistent with this Opinion. Costs of this appeal are taxed to Appellant, E.C., for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE

---

[19] For example, after Mr. Beyer asked Mother whether she continued to take her prescribed medication after her discharge from Crestwyn, Mother answered, "Do I have to answer that? I have been told that if you don't comply, you won't get your kids back, so put 'yes' I am taking them. But between me and you I couldn't work if I took them." Later, when asked by Mr. Beyer whether she would "continue to give" the children diatomaceous earth or other treatments for parasites if the children were returned to her, Mother responded "I don't want to answer that question. Just say . . . 'No'. Tell them I would seek medical treatment for them."

[20] In Dr. Freeman's evaluation, he noted that Mother's father stated that Mother left the care of one mental health professional specifically because she would not give Mother a report for court.